Randy BRADY, James Williams, Michael Fox, Jerry Hunter, Francis Pendergrass, Lacy Mounds, and Chris Watkins, individually and on behalf of all others similarly situated, and Curtiss Crawford and Lorenzo Mosely, Appellees,

v.

THURSTON MOTOR LINES, INC., Appellant.

No. 83–1765.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 3, 1984.

Decided Feb. 6, 1985.

Rehearing and Rehearing En Banc Denied March 13, 1985.

W.T. Cranfill, Jr., Charlotte, N.C. (J.W. Alexander, Jr., Blakeney, Alexander & Machen, Charlotte, N.C., on brief), for appellant.

Michael A. Sheely, Charlotte, N.C., for appellees.

Before RUSSELL, WIDENER and PHILLIPS, Circuit Judges.

WIDENER, Circuit Judge:

In the third appeal of this vigorously contested case, see 726 F.2d 136 affirming in part and reversing in part 532 F.Supp. 893 remand from 673 F.2d 1306, Thurston Motor Lines appeals an order of the district court granting back pay to three former Thurston employees who had prevailed in an employment discrimination action brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and the Civil Rights Act of 1866, 42 U.S.C. § 1981. After a Stage II proceeding before a Special Master, the district court awarded appropriate relief, including reinstatement and back pay to plaintiffs Francis Pendergrass, Randy Brady and James Williams.

On appeal, the sole issue is the quantity of back pay. Thurston does not now deny its duty to fulfill its back pay obligations, but it does contest the district court's determination of the appropriate periods of time for which the plaintiffs are entitled to recover. There are two questions relating to the issue. First, whether a prevailing Title VII plaintiff, after a successful action on account of his discharge, has foregone his back pay entitlement, when, following the discharge, he enrolls as a full-time college student while continuing to seek a full-time job, later accepts full-time, but not comparable, employment while in college, and does not thereafter seek comparable employment. Second, whether a prevailing Title VII plaintiff foregoes his period of back pay entitlement when he obtains similar employment following his discharge and

is then terminated for misconduct, for cause. The former question relates to plaintiff Pendergrass; the latter concerns plaintiffs Brady and Williams. We affirm the district court's award of back pay to Pendergrass, but vacate and remand the awards for Brady and Williams.

I

*Francis Pendergrass*

Francis Pendergrass was discharged from Thurston in June 1978. Following his dismissal, Pendergrass received unemployment compensation for a six-month period. During that time, he continued to search for full-time employment through the North Carolina Employment Security Commission. Unable to find a job, he utilized available student aid and enrolled as a full-time college student at Johnson C. Smith University in January 1979.

During his first semester in college, Pendergrass continued to actively seek full-time employment, and would have withdrawn from college had a job opened up. It was not until June 1979 that he obtained work, a temporary construction job which ended at the end of the summer. Pendergrass returned to school that fall on a full-time basis, while continuing to search for full-time second shift employment. In the early fall of 1979, Pendergrass secured work at a local country club. He worked after school hours Monday through Friday from 2:00 p.m. to 9:00 p.m. during the school year. During the summer he worked the same days from 1:00 p.m. until 10:00 p.m. Pendergrass was continuously employed at the country club for the same number of days and hours during the school years of 1979–1980, 1980–1981 and 1981–1982, and the intervening summers. From the time he got his job with the country club he did not seek other employment.

*Randy Brady*

Randy Brady was dismissed from Thurston in October 1976. He sought work at various places during the months which

followed, and received unemployment benefits for that period. He secured a sales position in January 1977. In September 1977, while still employed as a salesman, Brady accepted a position as a full-time supervisor in a warehouse at Thompson-Burke, a textile company. This employment was comparable to that of Thurston.

In January 1978, Brady was discharged from Thompson-Burke for violating stated company policy in the operation of the warehouse. Brady sought employment and was next employed in April 1978 at AEP Industries, where he remained until laid off in April 1981. He again sought employment and was hired by Kraft in June 1981, where he remained employed at the time of the Stage II proceeding.

### James Williams

In January 1978, James Williams was discharged by Thurston. Williams received unemployment compensation for several weeks before being hired by Standard Trucking as a warehouseman, a comparable job to that of Thurston. He held that job until January 1979, when he was dismissed for failure to load freight on the right truck, which was his third violation of company rules at Standard Trucking. Standard maintained an organizational policy of giving warnings for an employee's first two violations of company rules and discharging on the third violation. The parties stipulated and the Special Master and the district court found Williams was discharged for cause. Williams' next employment was as a security guard commencing in 1979. He quit the guard job to take a maintenance job, and was subsequently laid off. In March 1980, Williams was hired at Equipment Design and Manufacturing, where he was employed at the time of the Stage II hearing.

### II

At the Stage II proceeding, the Special Master took evidence and found that Pendergrass was entitled to back pay from the date of his discharge to the date of his enrollment as a full-time student. The Special Master also concluded that Brady and Williams were entitled to back pay from the date of their discharges by Thurston to the date of their reinstatement by that company, excluding the periods of time they were unemployed following their dismissals from Thompson-Burke and Standard Trucking, respectively. The district court, however, ordered that Pendergrass be awarded back pay for all of his time in college, as well as eliminating the periods of exclusion following discharge from the back pay entitlements of Brady and Williams.

On appeal, Thurston argues that by becoming a full-time college student, Pendergrass removed himself from the regular full-time job market, failed to mitigate the employer's damages, and thus lost entitlement to back pay for that period of time. It also argues that by being discharged for violating the company rules of their subsequent employers, Brady and Williams, in effect, voluntarily terminated their jobs. Thurston maintains this is a violation of the duty to mitigate damages, thereby excluding from back pay awards periods of unemployment following the discharges by the new employers, or ending the back pay entitlement completely.

### III

The awarding of back pay in Title VII cases is governed by Section 706(g) of the Civil Rights Act of 1964, 78 Stat. 261, as amended, 42 U.S.C. § 2000e–5(g). The first part of § 706(g) with which we are concerned is:

If the court finds that the respondent has intentionally engaged in ... an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay, .... 42 U.S.C. § 2000e–5(g).

In *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280

(1975), the Supreme Court noted that when choosing whether to award back pay, the "District Court's decision must ... be measured against the purposes which inform Title VII." Id. at 417, 95 S.Ct. at 2371. The Court discussed the dual purposes of Title VII as the elimination of employment discrimination and the restoration of persons aggrieved to the situation they would have occupied were it not for the unlawful discrimination.

The Court in *Albemarle* took notice of the fact that the back pay provision of Title VII "was expressly modeled on the back pay provision of the National Labor Relations Act." Id. at 419, 95 S.Ct. at 2372. In so doing, it recognized that in NLRA cases the National Labor Relations Board had consistently awarded back pay "as a matter of course." Id. at 420, 95 S.Ct. at 2372. The Court found that back pay provisions in both statutes were designed to fulfill the "make whole" purposes of the acts, and concluded that in Title VII cases "back pay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." Id. at 421, 95 S.Ct. at 2373.

Thus, the employer here does not contest that the award of some back pay was within the discretion of the district court, or that it was indeed required. At the same time, however, the right of a successful Title VII plaintiff to claim back pay is limited in degree by the statutory duty to mitigate employer damages, and the other part of Section 706(g) with which we are concerned provides in pertinent part:

"Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e–5(g).

In the case of a Title VII claimant who has been unlawfully discharged, the duty to mitigate damages requires that the claimant be reasonably diligent in seeking and accepting new employment substantially equivalent to that from which he was discharged. *Ford Motor Co. v. EEOC*, 458 U.S. 219, 232, 102 S.Ct. 3057, 3066, 73 L.Ed.2d 721 (1982).

Thus, a Title VII plaintiff cannot remain idle after an unlawful discharge and receive back pay for that period where he was not actively seeking employment. *Sangster v. United Air Lines*, 633 F.2d 864 (9th Cir.1980), cert. denied, 451 U.S. 971, 101 S.Ct. 2048, 68 L.Ed.2d 350 (1981); see *Edwards v. School Bd. of City of Norton, Va.*, 658 F.2d 951, 956 (4th Cir.1981). The discharged employee must make a reasonable effort to find other suitable employment. See *O'Neal v. Gresham*, 519 F.2d 803, 805 (4th Cir.1975). Indeed, the claimant "forfeits his right to back pay if he refuses a job substantially equivalent to the one he was denied." *Ford Motor Co. v. EEOC*, 458 U.S. at 232, 102 S.Ct. at 3065–66. Moreover, where the discharged Title VII plaintiff subsequently finds similar employment, but then voluntarily quits, back pay should be decreased by the amount he would have earned had he not quit. See *NLRB v. Miami Coca Cola Bottling Company*, 360 F.2d 569 (5th Cir. 1966).

It is therefore the general rule that a Title VII claimant's voluntary refusal to seek or accept substantially equivalent employment, or to remain in such a job once secured, risks or even insures a loss of back pay. In the present case, Thurston argues that this rule also extends to cases where, following the unlawful discharge, the claimant either enrolls as a full-time student or is dismissed for violating an employer's rule in a subsequent job. We first address the rule's application to Francis Pendergrass and his enrollment as a full-time student.

In determining the extent of Thurston's back pay obligation to Pendergrass, we concern ourselves with two periods of time. The first is the period Pendergrass was unemployed following his dismissal, between June 1978 and June 1979. The second time period is that which spanned his

employment at the construction company and the country club, beginning in June 1979.

During the period June 1978 to June 1979, the record is undisputed that Pendergrass continued to search for suitable, full-time employment. He satisfied the requirements of the North Carolina Employment Commission for actively seeking employment, and made numerous inquiries on his own. Thus, Pendergrass fulfilled his duty to mitigate damages by exercising reasonable diligence to find other suitable employment. *Ford Motor Co. v. EEOC*, 458 U.S. at 231, 102 S.Ct. at 3065.

■■■ Thurston contends that by enrolling in college in January 1979 Pendergrass removed himself from the regular job market, and so failed to exercise reasonable diligence. In making this argument, Thurston has the burden of proving Pendergrass failed to exercise such diligence in seeking employment. *Sprogis v. United Airlines, Inc.*, 517 F.2d 387, 392 (7th Cir. 1975). The record shows without contradiction that Pendergrass continued to search for full-time employment during his first semester in college, and that he would have accepted employment and quit college had a job become available. Thurston did not rebut such testimony, and did not meet its burden of proof. We thus affirm the district court's holding (the Special Master to the contrary, for the 1979 spring semester, see FRCP 53(e)(2)) that Pendergrass used reasonable diligence in seeking full-time employment between June 1978 and June 1979, satisfied his duty to mitigate damages, and was entitled to back pay for that period.

The period beginning in June 1979 presents a different issue. From June 1979 to August 1979, Pendergrass was employed full-time in a summer construction job. When the job ended, Pendergrass returned to college, and in two weeks had secured full-time employment at the country club. He kept the job at the country club throughout the remainder of his school years. Both the construction and country club jobs paid considerably less

than Pendergrass' employment at Thurston. Pendergrass acknowledged that he ceased looking for higher paying employment opportunities beginning with his employment at the country club.

Thurston argues that Pendergrass' willingness to accept a lower paying position than he possibly could have obtained had he continued looking, along with his continued enrollment in college, establishes that Pendergrass failed to exercise reasonable diligence in finding other suitable employment. In our opinion, however, Pendergrass' status as a college student was incidental to the essential question of whether once an unlawfully discharged Title VII claimant has exercised reasonable diligence to find similar employment, has been unable to do so, and then accepts a lower paying job, does the duty to mitigate damages require that claimant continue to search for higher paid employment. We believe it does not.

In *Ford Motor Co. v. EEOC*, 458 U.S. at 226, n. 8, 102 S.Ct. at 226, n. 8, the Court noted that Title VII's back pay provision, § 706(g), was "expressly modeled" on the analogous remedial provision of the National Labor Relations Act (NLRA). See § 10(c), 49 Stat. 454, as amended, 29 U.S.C. § 160(c); *Albemarle Paper Co. v. Moody*, 422 U.S. at 419, and n. 11, 95 S.Ct. at 2372, and n. 11. As a result, the Court in *Ford Motor Company* relied extensively on NLRA back pay principles in developing the opinion. Such guidance from back pay decisions arising under the NLRA is appropriate here, as well.

■■■ For a Title VII claimant to fulfill his duty to mitigate damages, it is clear that he "need not go into another line of work, accept a demotion, or take a demeaning position." *Ford Motor Co. v. EEOC*, 458 U.S. at 231, 102 S.Ct. at 3065; see, e.g., *Hanna v. American Motors Corp.*, 724 F.2d at 1309 (Vietnam veteran); *Williams v. Albemarle Board of Education*, 508 F.2d 1242 (4th Cir.1974) (§ 1983 case). This rule has similarly been applied on behalf of NLRA claimants. *NLRB v. Madison Courier, Inc.*, 472 F.2d 1307, 1317–

1321 (D.C.Cir.1972). In NLRA cases, however, it has been held that after an extended period of time searching for work without success, a claimant must consider accepting suitable lower paying employment in order to satisfy the duty to mitigate damages. See, e.g., *NLRB v. Southern Silk Mills*, 242 F.2d 697, 700 (6th Cir.1957), cert. denied, 355 U.S. 821, 78 S.Ct. 28, 2 L.Ed.2d 37 (1957); *NLRB v. Moss Planning Mill Co.*, 224 F.2d 702, 705 (4th Cir. 1955).[1] The period of back pay entitlement continues to run during the employment at a lower paying job, with any earnings deducted from a subsequent back pay award. See *Merriweather v. Hercules, Inc.*, 631 F.2d 1161, 1168 (5th Cir.1980) (Title VII); *Taylor v. Philips Industries, Inc.*, 593 F.2d 783, 787 (7th Cir.1979) (Title VII). Indeed, under § 706(g), the rule is that the amount of the back pay award should be "reduced by any earnings acquired during the interim period regardless of the type of work involved." *Merriweather v. Hercules, Inc.*, 631 F.2d at 1168.

Thus, for purposes of fulfilling the statutory duty to mitigate damages, the rule which the courts have approved is that Title VII and NLRA claimants may, and in some instances must (for an NLRB claimant), accept lower paying jobs when their search for employment similar to that from which they were discharged proves futile. What has not been so clearly determined is whether such a claimant who accepts a lower paying job, and wishes to maintain it, nevertheless has a duty to maintain a continued search for higher paying employment.

In *J.H. Rutter Rex Manufacturing Co., Inc. v. NLRB*, 473 F.2d 223 (5th Cir.1973), a group of claimants had worked at lower paying jobs following their unlawful discharges. Evidence was presented establishing that the claimants diligently sought similar employment following their discharges but had been unsuccessful. The employer contended that this failure to secure similar employment violated the duty to mitigate damages. In upholding the back pay awards of those claimants who remained in low paying jobs, the court held that where the employees were forced to " 'lowe[r] their sights' . . . accepting what might have been the best job available, the claimants were doing all that could reasonably be expected of them by way of mitigation." Id. at 242.

This reasoning is similar to that of an earlier NLRB decision. In *East Texas Steel Castings Company, Inc.*, 116 NLRB 1336 (1956), the Board held that where a claimant had unsuccessfully searched for similar employment, and then accepted a lower paying job, he had exercised reasonable diligence in mitigating damages when he chose to keep that lower paying job. The Board determined that in choosing to remain with steady, albeit lower paying, employment, the employee was acting reasonably in seeking a regular income. This was true even where the employee had ceased looking for new employment. *East Texas Steel Castings Company, Inc.*, 116 NLRB at 1345.

In our case, Pendergrass had searched diligently for suitable employment for a year following his unlawful discharge. Unable to secure a job similar to his work at Thurston, he chose to pursue his education while continuing to seek full-time employment. In view of the circumstances, the choice was entirely reasonable. Although accepting the country club job and choosing to remain there meant for Pendergrass a reduced income, the position was steady and the wages regular. We think a year of fruitless searching for comparable work was enough, that Pendergrass was justified in accepting the job at the country club, that he was in school was incidental, and that he exercised reasonable diligence to find other suitable employment.

We do not think our opinion is inconsistent with *Taylor v. Safeway Stores, Inc.*, 524 F.2d 263 (10th Cir.1975), and *Washington v. Kroger Co.*, 671 F.2d 1072 (8th

1. Whether note 14, 458 U.S. at p. 231, note 14, 102 S.Ct. at p. 3065, in *Ford Motor Co.*, will affect like decisions under the NLRA is a question we need not address.

Cir.1982), both of which decisions denied back pay for full-time college students who had entered school following discriminatory discharges.

In *Taylor,* the court stated that "when an employee opts to attend school, curtailing present earning capacity in order to reap greater future earnings, a back pay award for the period while attending school would be like receiving a double benefit." 524 F.2d at 268. *Washington* adopted this approach as a general rule but stated that it did not hold that "... backpay either does or does not continue to run in every case of a plaintiff who has chosen to go to school full-time. Here, the district court evidently felt that plaintiff had effectively removed herself from the employment market. Some full-time students, those who attend classes at night, for example, are also full-time employees." 671 F.2d at 1079. In the *Taylor* case, the plaintiff, however, had little or no earnings and the court recited that his then present earning capacity had been curtailed. In the *Washington* case, the court of appeals reasoned that the district court evidently felt that the plaintiff "had effectively removed herself from the employment market." 671 F.2d at 1079. We take notice that the vast majority of full-time college students could not also hold down a full-time job, and that in the usual case when one decides to attend college on a full-time basis, it does curtail his present earning capacity and effectively removes him from the employment market. So we subscribe to the general rule as laid down in the *Taylor* case. But here the facts are quite different. Pendergrass remained in the job market which is shown conclusively by the fact that he did maintain a full-time job during all the time he was in college. Prior to obtaining that job, he had unsuccessfully looked for work for a year and had accepted summer employment for less pay than he was making with Thurston. It is no use to say that Pendergrass could have obtained a better job had he looked. He looked for a year. Thurston has offered no proof of any better job available during the time that Pendergrass held his full-time job

with the country club as well as attending college full-time. Had Pendergrass simply accepted a lower paying job after a year of fruitless search, his back pay would have continued subject to credits for the amount that he earned, as we have set forth above, for he would have been justified in accepting the lower paying employment. Thus, we do not think he should be penalized merely because he attended college during the time he was so employed. That would seem to us to place a penalty on diligence. Had Pendergrass simply chosen to attend college full-time and not been employed full time, of course he would not have been entitled to back pay during the time he attended college under the rule of the *Taylor* and *Washington* cases.

In reviewing the determinations of the back pay periods of Randy Brady and James Williams, however, we arrive at a different result.

At trial, Thurston argued that Brady and Williams were discharged from their subsequent employment for cause, and that these discharges, in effect, constituted voluntary terminations of employment since they chose to violate employer rules. Both the Special Master and the district court found that the discharges had been for violation of employer rules. However, the district court concluded, contrary to the Special Master, that there was not a failure to mitigate since neither Brady nor Williams had been found to have engaged in "misconduct" within the meaning of the North Carolina Employment Security Law. N.C.G.S. § 96–14(2). This misconduct standard is used by the North Carolina courts and Employment Security Commission in determining which employees are disqualified from receiving unemployment compensation upon being dismissed for cause. The standard is defined as "conduct which shows a wanton or wilful disregard for the employer's interest, a deliberate violation of the employer's rules, or a wrongful intent." *Intercraft Industries Corp. v. Morrison,* 305 N.C. 373, 289 S.E.2d 357, 359 (1982); *In Re Collingsworth,* 17 N.C.App. 340, 344, 194 S.E.2d 210 (1973).

The district court concluded that because Brady and Williams were found eligible for unemployment compensation following their respective discharges from Thompson-Burke and Standard Trucking, their dismissals for rule violations did not amount to such misconduct as to be called voluntary terminations. It stated: "[w]hile voluntary actions which result in the refusal or loss of employment generally end the right to back pay, honest mistakes which lead to termination are not 'voluntary' losses of employment, as implicitly recognized in the North Carolina law of employment compensation. Accordingly, both Brady and Williams will recover back pay for the period during which they were unemployed following their termination for cause in subsequent employment."

We believe the application of the North Carolina standard for eligibility for unemployment compensation benefits to a Title VII back pay claim is inappropriate. The purposes served by the provision of unemployment benefits and the duty to mitigate damages are unrelated. Unemployment compensation is designed to maintain unemployed individuals and their families, giving them subsistence in between gainful employment. Thus, the range of misconduct a discharged worker must engage in to be denied these benefits is held to be narrow, and benefits are denied only to those whose discharges result from wanton, or wilful, deliberate, or intentional behavior.

 This standard we think is too narrow for purposes of defining a voluntary loss of employment in a Title VII back pay claim. An individual who has been discriminatorily discharged must exercise "reasonable diligence" in finding other suitable employment. *Ford Motor Co. v. EEOC,* 458 U.S. at 231, 102 S.Ct. at 3065. In order to give this requirement effect, we are of the opinion the Title VII claimant must also use reasonable diligence to maintain any suitable employment which is secured. To permit otherwise would force the Title VII defendant to pay for the misconduct of a claimant in subsequent employment. We do not think that such a result is properly related to the make whole objective of back pay.

In determining what reasonable diligence requires, it seems clear that it should not permit all on the job behavior except wilful or wanton conduct. The standard of reasonable diligence is more discerning. It requires instead that in maintaining subsequent employment, a Title VII claimant act reasonably and responsibly in accordance with employer rules. As noted earlier, the duty of a Title VII plaintiff to mitigate damages includes the obligation to accept a "job substantially equivalent to one he was denied." *Ford Motor Co. v. EEOC,* 458 U.S. at 232, 102 S.Ct. at 3066; see *Edwards v. School Bd. of City of Norton, Va.,* 658 F.2d at 956. Such a duty of necessity includes the obligation to make reasonable and good faith efforts to maintain that job once accepted. When either of these obligations are not met, a claimant should be said to have voluntarily removed himself from the job market or the work place and forfeited his right to back pay. See *Ford Motor Co. v. EEOC,* 458 U.S. at 232, 102 S.Ct. at 3066.

The parties do not call to our attention any court which has considered the effect a discharge for misconduct from interim employment should have on a back pay claim, but we find instructive the considerable authority among the decisions of reviewing courts as well as the NLRB supporting the long-standing principle that a claimant who voluntarily quits comparable, interim employment fails to exercise reasonable diligence in the mitigation of damages. E.g. *NLRB v. Aycock,* 377 F.2d 81, 87 (5th Cir.1967); *NLRB v. Miami Coca-Cola Bottling Co.,* 360 F.2d 569, 575 (5th Cir.1966); *NLRB v. Mastro Plastics Corp.,* 354 F.2d 170, 174, n. 3 (2d Cir.1965); see e.g. *Shell Oil Co.,* 218 NLRB 87, 90 (1975); *Gary Aircraft Corp.,* 211 NLRB 554, 557 (1974); *Mastro Plastics Corp.,* 136 NLRB 1342, 1350 (1962). The courts have also approved this general rule for application in employment discrimination cases. *DiSalvo v. Chamber of Commerce, etc.,* 568 F.2d

**1278**

593, 597–598 (8th Cir.1978); see e.g. *Stone v. D.A. & S. Oil Well Servicing Inc.*, 624 F.2d 142, 144 (10th Cir.1980); *Muller v. United States Steel Corp.*, 509 F.2d 923, 930 (10th Cir.1975).

However, in order to assure fulfillment of the compensatory objective of back pay provisions, the rule that voluntary termination of interim employment tolls the back pay period is not unqualified. Thus, a voluntary quit does not toll the period when it is prompted by unreasonable working conditions or the earnest search for better paying employment. See, e.g. *NLRB v. Mastro Plastics Corp.*, 354 F.2d at 174, n. 3; *Stone v. D.A. & S. Oil Well Servicing Inc.*, 624 F.2d at 144; *Shell Oil Co.*, 218 NLRB at 89; *John S. Barnes Corp.*, 205 NLRB 585, 588 (1973); *Winn-Dixie Stores, Inc.*, 170 NLRB 1734, 1744 (1968). The back pay period is tolled, however, when the voluntary termination is without compelling or justifying reasons. *Knickerbocker Plastics Co., Inc.*, 132 NLRB 1209, 1212 (1961). For example, the period is tolled when the quit is motivated by personal reasons unrelated to the job or as a matter of personal convenience. See *Rosen, etc.*, 270 NLRB (No. 23) (1984); *Medline Industries, Inc.*, 261 NLRB 1329, 1332 (1982); *East Texas Steel Castings Company, Inc.*, 116 NLRB at 1347; *Kartarik, Inc.*, 111 NLRB 630, 635 (1955), enf. 227 F.2d 190 (8th Cir.1955).

■ It is apparent to us from a review of the decisions that the rule merely represents a particular application of the statutory duty to exercise reasonable diligence in mitigating damages. *NLRB v. Mastro Plastics Corp.*, 354 F.2d at 174, n. 3; see *Ford Motor Co. v. EEOC*, 458 U.S. at 231, n. 15, 102 S.Ct. at 3065, n. 15; *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 197–198, 61 S.Ct. 845, 853–854, 85 L.Ed. 1271 (1941). When an NLRA or Title VII claimant voluntarily terminates suitable, interim employment, he has freely chosen to incur a loss of earnings, thereby failing to use reasonable diligence in the mitigation of damages. See *NLRB v. Aycock*, 377 F.2d at 87; *Muller v. United States Steel Corp.*,

509 F.2d at 930; *NLRB v. Miami Coca-Cola Bottling Company*, 360 F.2d at 575.

■ The reasoning for limiting back pay liability following a voluntary termination of interim employment is drawn from the central purpose served by the granting of back pay. Back pay is essentially designed as a "make whole" remedy, returning the claimant to the financial position he would have been in had the unlawful discrimination not occurred. *Albemarle Paper Co. v. Moody*, 422 U.S. at 418–421, 95 S.Ct. at 2372–2373; *Phelps Dodge Corp. v. NLRB*, 313 U.S. at 197–198, 61 S.Ct. at 853–854. As part of the process of making the victims of employment discrimination whole, the offending employer is made responsible only for losses suffered by the claimant as a result of the discrimination. That is, the employer's back pay liability is not to be increased as a result of losses willingly incurred by the claimant. See *Ford Motor Co. v. EEOC*, 458 U.S. at 231, n. 15, 102 S.Ct. at 3065, n. 15 (citing *Phelps Dodge Corp. v. NLRB*, 313 U.S. at 197–198, 61 S.Ct. at 853–854). To hold that employers are liable for losses incurred due to a claimant's unjustified, voluntary termination of interim employment renders the back pay obligation punitive, and abuses the intent of the remedy. It is manifest that the back pay provisions of the NLRA and Title VII are compensatory and remedial in purpose, not punitive. See *Robinson v. Lorillard*, 444 F.2d 791, 802 (4th Cir.1971), cert. den. 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971); *NLRB v. Aycock*, 377 F.2d at 88.

■ We are thus of opinion that the rationale which supports the tolling of the back pay period following a voluntary quit should also apply to those terminations which result from a violation of an employer's rules. It would be incongruous to hold that while Title VII claimants cannot voluntarily terminate suitable, interim employment without suffering a back pay reduction, they may choose without penalty to risk the loss of similar employment by engaging in misconduct. To permit claimants the freedom of substantially unrestrained

conduct during interim employment, unfettered by the loss of back pay, would serve only to punish the employer for the misconduct of the claimant, and be inconsistent with the requirement of exercising reasonable diligence.

In the present case, the Special Master as well as the district court found that Brady and Williams were discharged from their subsequent employment for violating the stated rules of their respective employers and that the discharges were justified. The record supports these findings. In both instances, the plaintiffs had been given instructions as to the behavior expected of them and failed to fulfill such expectations. Indeed, for Williams the rule violation which prompted his dismissal was his third such violation.

We think that the action of Brady and Williams in violating their employers' rules to the extent that they were justifiably discharged amounts to a lack of reasonable diligence in maintaining interim employment, and so hold.

We are unwilling to follow what is apparently the NLRB's latest formulation of its rule in an NLRA proceeding that "... the discharge of a discriminatee for cause by an interim employer who has found his job performance unsatisfactory does not constitute a wilful loss of earnings on the part of the discriminatee in the absence of an offense involving moral turpitude." *Mid-America Machinery Co.*, 258 NLRB 316, 319 (1981). We think that such a standard requiring moral turpitude is simply not equated to "reasonable diligence" in seeking and maintaining other employment as mentioned in *Ford Motor Co.*, 458 U.S. at p. 231, 102 S.Ct. at p. 3065, and 42 U.S.C. § 2000e–5(g). Rather, we think that other statements of the Board made in the context of a discriminatee's quitting interim employment should apply here. They are to the effect the claimant should "either look for or keep" interim employment, and not act "unreasonably" with respect to it. *Mastro Plastics*, 136 NLRB at 1346, 1347. He must "prudently retain such employment," *Florida Steel Corp.*, 234 NLRB

1089, 1092 (1978), or run the risk of being subject to an exclusion of back pay for the amount he would have earned.

This brings us to the final item in the case: what effect do the discharges for cause have on the back pay due to Brady and Williams?

We think the correct rule to apply in situations such as the ones before us here, and so decide, is similar to the rule applied by the NLRB in cases in which a discriminatee has unjustifiably quit interim employment. The first statement of the rule we find is in *Knickerbocker Plastic Co., Inc,* 132 NLRB 1209, 1215 (1961):

We further find that, as a result of such quitting, each of these claimants shall be deemed to have earned for the remainder of the period for which each is awarded backpay the hourly wage being earned at the time such quitting occurred. Therefore, an offset computed on the appropriate rate per hour will be deducted as interim earnings from the gross backpay of each of these claimants. This offset shall be made applicable from the date of the unjustified quitting throughout the remainder of the backpay period for each particular claimant. In this connection, where the claimant has secured other employment during the time that the offset is applicable, and if, on a quarterly basis, she earned a greater amount than the offset, the offset will not be applied, but the actual interim earnings will be deducted from gross backpay. If she earned less than the offset at employment secured subsequent to the quitting, also on a quarterly basis, the amount of the offset will be applied.

The *Knickerbocker Plastics* rule seems to have been followed by every court which has considered the matter of unjustifiably quitting interim employment. *NLRB v. Hopcroft Art & Stained Glass Works*, 692 F.2d 63 (8th Cir.1982); *NLRB v. Aycock*, 377 F.2d 81 (5th Cir.1967) (construed *Phelps Dodge* but arrived at the same rule); *Griffin v. George B. Buck Consulting Actuaries*, 566 F.Supp. 881 (S.D.N.Y.

1983); see *NLRB v. Laredo Packing Co.*, 730 F.2d 405 (5th Cir.1984). As well, the NLRB has consistently applied the rule. E.g. *Medline Industries*, 261 NLRB 1328 (1982); *Gary Aircraft Corporation*, 211 NLRB 554 (1974).

We think the *Knickerbocker* rule should apply in this case with two minor exceptions. First, the statute, 42 U.S.C. § 2000e–5(g), requires a credit for all earnings, so computing that figure quarterly, as the NLRB does, should not apply. Second, we think that periods of unemployment following justified discharges are to be completely excluded from the back pay period. During such a period the claimant has excluded himself from the employment market.

We now apply this rule to Brady and Williams.

Brady is entitled to back pay from the time of his discharge by Thurston until the day of his discharge by Thompson-Burke; during this period, Thurston should receive a credit for the wages Brady actually earned. During the period of unemployment following the Thompson-Burke discharge, Brady is entitled to no back pay. The back pay period commences to run again upon Brady's reemployment by AEP Industries; for such reemployment period Thurston should receive a credit for the wages Brady would have earned had he remained at Thompson-Burke at the wage rate effective upon that discharge, or the wages he did earn, whichever is greater.

Williams should receive back pay from the date of his discharge by Thurston until the date of his discharge by Standard Trucking; during such period Thurston should receive a credit of the wages actually earned. During the period of unemployment following the Standard Trucking discharge, Williams is entitled to no back pay. The back pay period commences to run again upon Williams' reemployment as a security guard; for such reemployment period, Thurston should receive a credit for the wages Williams would have earned had he remained at Standard Trucking at the wage rate effective upon that discharge, or the wages he did earn, whichever is greater.

The record on appeal is uncertain as to the rates of pay earned by Brady and Williams at the times of their discharges for misconduct from Thompson-Burke and Standard Trucking, respectively, and may even be uncertain as to the rates of pay Brady and Williams were earning or should have been earning at the time of their discharges by Thurston. This is probably explained by the fact that the parties stipulated in the district court that they would agree on the amounts of back pay due once the rules for payment and the back pay periods were determined by the court. We hasten to add that this is an actual controversy under Article III of the Constitution; the parties have only removed from contention a part of the issues which divide them.

If Williams was earning an equal or greater rate of pay at the time of his discharge from his interim employment at Standard Trucking than he was earning at Thurston at the time of his discharge there, then, of course, in any event, he is entitled to no back pay from the time of his Standard Trucking discharge because the credit due to Thurston would at least equal its liability from that point on.

The same principle applies to Brady, but his case is a little different. His rate of pay for back pay purposes at the time of his discharge from Thurston is not what he actually was earning, but what he would have earned as a line foreman there. Thurston's failure to promote him to line foreman previously has been litigated to final judgment in this case.

The judgment of the district court is accordingly

AFFIRMED IN PART; VACATED IN PART; and REMANDED.