803 F.2d 1181
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
David M. Miller; David Whitlock and James T. Dunham,
Appellees, and Melvin Meeks; James Scott and
James Winchester, Plaintiffs
v.
Tar Heel Container Corporation, Appellant.
 No. 85-2171.
 United States Court of Appeals, Fourth Circuit.
 Argued July 17, 1986.
Decided Oct. 15, 1986.
 
 W.D.N.C.
 AFFIRMED IN PART; REVERSED IN PART.
 Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. James B. McMillan, District Judge. (CA 83-225; 83-257).
 Before SPROUSE and CHAPMAN, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.
 CHAPMAN, Circuit Judge.
 SPROUSE, Circuit Judge.
 Michael P. Mullins (Mullins & Van Hoy on brief) for Appellant; Louis L. Lesesne, Jr., for Appellees David Miller and David Whitlock; James Douglas Hill for Appellee James T. Dunham; (Gillespie and Lesesne on brief) for Appellee.
 CHAPMAN, Circuit Judge:
 
 
 1
 Appellees brought this Title VII action against their former employer, Tar Heel Container Corporation, alleging that they had been denied promotions and discharged on the basis of race. Following a bench trial, the district court entered judgment for appellees. Tar Heel appeals, arguing that the court's findings of racial discrimination are clearly erroneous and that the back pay award was improperly calculated. We affirm in part and reverse in part.
 
 
 2
 * Tar Heel manufactures corrugated cardboard containers. Its manufacturing processes require a number of large machines, many of which are operated by crews of two to four employees. Since the entire crew must be present at the beginning of each shift for production to proceed efficiently, the district court found that Tar Heel has a legitimate business interest in reducing tardiness and absenteeism among its production employees.
 
 
 3
 In March 1978, Tar Heel promulgated a new written policy on tardiness and absenteeism: employees who were tardy six times in a calendar year were subject to discharge, with a three-day suspension to follow the fifth tardy, and employees accumulating three unexcused absences in a calendar year were also subject to discharge, with a three-day suspension to follow the second unexcused absence. The company continued the policy of requiring employees who anticipated absence due to illness to call their supervisors; the absences were excused only with a doctor's excuse covering the time of absence. Finally, persons absent for three consecutive working days without notifying the company were considered to have quit and would be reinstated only upon proof of an acceptable reason for the absence and inability to notify the company.
 
 
 4
 David M. Miller sustained an on-the-job back injury in April 1978. On July 7, after he was back on the job, he was given time off to seek a job with lighter work; Tar Heel argues that he was released for a limited time and only to apply for a job at Duff Norton Company. Upon returning to the plant, Miller was told that he could not go back to work until he obtained a certificate that he had applied for a position at Duff Norton. He had been unable to see the appropriate person at Duff Norton to submit an application, but he did obtain a certificate stating that he had applied to the Charlotte Housing Authority. On July 10, Miller was told that his certificate was no acceptable, and he was terminated.
 
 
 5
 David Whitlock allegedly sought a promotion to mechanics position from 1974 to 1977. Although Tar Heel maintained no listings of job qualifications, Whitlock believed that he was qualified because of his experience and familiarity with a number of the machines in the plant. Whitlock never received a mechanics' position. Later, on July 18, 1978, Whitlock missed work because he had lost his car keys and had to have new ones made. He had already accumulated two unexcused absences, but he had not been suspended after the second absence as the rules provided. He also missed July 19 because of medical treatment, and he returned to work on July 20 with a doctor's certificate for July 19. He was terminated on the spot because of his unexcused absences and was told that his certificate was "no good."
 
 
 6
 James T. Dunham became ill on the job on March 30, 1977. He saw a doctor, who diagnosed a kidney infection and gave him a certificate. He returned to work on April 22 and worked three days. After arriving at work on April 28, he again became ill. He left work--there is a dispute as to whether he told anyone--and sought treatment at the Mental Health Center as his doctor had instructed. The next day, Johnston wrote up Dunham's termination for having walked off the job and quit; Dunham was immediately notified. The Center gave Dunham a letter dated April 29 stating that he was unable to work, but he did not take the letter to Tar Heel until at least May 16. Tar Heel refused to accept the Center's reports as justification for Dunham's absence.
 
 
 7
 In 1983, Miller, Whitlock, and Dunham, in addition to three others who are not involved in this appeal, filed this Title VII action in the U. S. District Court for the Western District of North Carolina alleging that they had been denied promotions and had been discharged because of race. Following a bench trial before Judge McMillan, the court found that Tar Heel had discriminated against Miller, Whitlock, and Dunham; the court ordered their reinstatement and awarded back pay. Tar Heel appeals.
 
 II
 
 8
 Tar Heel argues that the court's findings of discrimination are clearly erroneous. Guided by the Supreme Court's decision in Anderson v. City of Bessemer City, 470 U.S. 564, 105 S. Ct. 1504, 84 L.Ed. 2d 518 (1985), we have carefully reviewed the record and conclude that certain findings are clearly erroneous. The basic problems are with the comparisons drawn between the treatment of the black and white employees and the complete disregard of documentary evidence that supports a number of Tar Heel's actions, showing that such actions were not discriminatory but rather were in keeping with the company rules and regulations. We will discuss each individual separately.
 
 A. David Miller
 
 9
 Tar Heel contended that Miller was excused from work subject to specific limitations and that he was discharged for not complying with those limitations. Tar Heel's evidence concerning the discharge focused on the testimony of Mr. Lefler, the plant manager; Mr. Cooper, Miller's supervisor; and two exhibits. Lefler and Cooper testified that Miller was released for two hours to interview with Duff Norton Company. To the contrary, Miller had testified that there were no restrictions and that he had been released for the whole day. The exhibits are Miller's July 7 absentee report and a memo accompanying his termination. The absentee report states that Miller was released at 9:00 A.M. for approximately one and a half hours. The memo indicates a release to "interview for a lighter work type job. Said it would take 1 1/2 hr."
 
 
 10
 The court found that Tar Heel's explanation was pretextual and that Miller had been discharged because of his race. We cannot say that this finding is clearly erroneous. The court faced a clear conflict between the testimony of Miller and of Lefler and Cooper, and it is the province of the finder of fact to make credibility determinations. The exhibits do not strongly support either position, but significantly, they do not establish a time limitation or state that Miller was being let off only to interview with Duff Norton. The finding that Miller's discharge was discriminatory must be affirmed.
 
 B. David Whitlock
 
 11
 The court found that Tar Heel had discriminated against Whitlock by denying him a promotion to a mechanic's position and by discharging him for unexcused absences when white employees' absences had been excused in similar situations. A review of the record, however, shows that these findings are clearly erroneous.
 
 
 12
 With respect to the promotion, Whitlock identified only one vacancy that he was denied; that was about May 15, 1978. The evidence does not reflect the nature of the specific position or who was hired to fill it. The court below refers to both Earl Pressley and Larry Munsen, yet the testimony indicates that they were hired in 1976 or 1977. Pressley's 1977 absentee calendar, Plaintiff's Exhibit 89, shows that Pressley was hired no later than January 1977.
 
 
 13
 The only testimony that Whitlock was qualified was his own testimony. When first asked how he was qualified, he stated that he had operated a Ward die cutter "a lot of times." On cross examination, he admitted that he had never fixed a corrugator. Later, he stated that he had done repair work for his prior employer, York Corrugated, yet in his application for employment at Tar Heel, he described his duties at York as that of a ward helper and made no reference to having worked on any machines. There is no testimony or other evidence that Tar Heel was on notice of these alleged qualifications. Concerning his other experience, the application shows only that he had been a janitor and a tile setter's helper. Given these great deficiencies in the evidence, the court was clearly erroneous in finding that Tar Heel's failure to promote him was discriminatory.
 
 
 14
 With respect to the discharge, the court's finding that Whitlock was not suspended or warned following his second absence is incorrect. It ignores Defendant's Exhibit 99, a "MEMORANDUM ON VIOLATION OF RULES, ETC." that is addressed to David Whitlock and dated April 17, 1978, the date of his second unexcused absence. The memorandum states, in part: "This will confirm the reprimand Mr. Peeler gave you regarding: 1. Infraction of the rule regarding absenteeism . . . [The] next [absence] (unexcused) will be cause for termination. This is the final warning and becomes a part of your record." Whitlock signed the memorandum at the bottom.
 
 
 15
 The court referred to certain white employees who supposedly were not discharged after their third unexcused absence to try to show disparate treatment of Whitlock. Timothy Broome and Terry McManus, see Plaintiff's Exhibits 62 and 116, only illustrate a policy that the court overlooked: that Tar Heel did not count Sunday absences against employees. Not counting the Sunday absence, Broome had two unexcused absences, and McManus had three. McManus was terminated following the third unexcused absence, this in spite of the fact that he had inadvertently not been suspended following his second absence because two separate supervisors had written up the first two absences.
 
 
 16
 The court's other comparisons to white employees are either premised upon its incorrect statement that Whitlock was not warned following his second absence or relate to the issue of whether the doctor's excuse that Whitlock brought in on July 20 was acceptable. This latter issue, which relates to the possibility of a fourth unexcused absence, need not be considered since Whitlock had already accumulated three unexcused absences and was therefore subject to discharge. The court's finding of a discriminatory discharge is clearly erroneous.
 
 C. James Dunham
 
 17
 Tar Heel contends that Dunham was fired because he walked off the job and quit without permission and did not thereafter notify the company of any alleged illness for a considerable period of time. After comparing a number of white employees, the court concluded that black employees were held to a stricter standard than white employees and that race was a significant producing cause in Dunham's discharge. Having examined the record concerning the white employees used as a comparison, we find that the court's finding is clearly erroneous.
 
 
 18
 Tar Heel's actions are fully consistent with its well-known rule that employees absent for three consecutive working days without notifying the company would be discharged. Even if Dunham did tell his supervisor that he was leaving because he was ill, he was still required to notify Tar Heel of his absences in the days that followed. The evidence is that he did not do so.
 
 
 19
 The white employees that the court used to show disparate treatment are not applicable. The court refers to a number of employees whose absences were excused based on doctor's slips dated after their absences, but it ignores the documentary evidence showing that they complied with company rules by calling in before their absence, which Dunham did not do. With regard to Kermit Funderburk, Defendant's Exhibit 178 shows absentee reports dated June 14 and 16, 1978, that reflect that he gave Tar Heel advance notice of his absence, followed with a doctor's excuse. Likewise, William Eddington, Defendant's Exhibit 183H; Dennis Pilgrim, Defendant's Exhibits 156,178; Eddie Catoe, Defendant's Exhibit 180.
 
 
 20
 Timothy Broome's absences were also excused. There were doctor's certificates in the company files showing his condition, see Plaintiff's Exhibit 59; Defendant's Exhibit 183C, and Broome called the company in advance because of his condition. Theodore Rink was out of work for over a year because of a bad industrial accident at the plant. Tar Heel clearly explained that he did not have to call in each day because Tar Heel's workmen's compensation carrier kept Tar Heel advised of the employee's progress under those circumstances.
 
 III
 
 21
 Concerning the award of back pay, Tar Heel argues that the back pay awards to Miller and Dunham should be tolled for voluntarily terminating substantially similar employment after leaving Tar Heel. Finding that Tar Heel did not discriminate against Dunham, we consider this argument only as to Miller.
 
 
 22
 Tar Heel argues that Miller left Stronghaven, another container company, out of personal convenience and intent to reenter the carpet industry, thus abandoning the container industry. In one of the hearings on damages, Miller testified:
 
 
 23
 The reason I left Stronghaven was for a better job, plus the supervisor, me and him, we had a disagreement on a few things. I really left for a better job, making more money and plus I left for a carpet job, another carpet job.
 
 
 24
 He went on to testify that he made $6.00 per hour at Piedmont Floor Covering, his new job, whereas he had been making $5.50 per hour at Stronghaven. The district court found that Miller had "diligently pursued employment throughout the back pay period and only left employment to pursue better jobs."
 
 
 25
 In Brady v. Thurston Motor Lines, Inc., 753 F.2d 1269 (4th Cir. 1985), this court considered the award of back pay in the Title VII context, including the voluntary termination of substantially similar employment. We stated that "a voluntary quit does not toll the period when it is prompted by unreasonable working conditions or the earnest search for better paying employment." Id. at 1278. We agree with the district court that Miller left Stronghaven for a better job, and this does not toll or reduce the back pay award.
 
 
 26
 For the foregoing reasons, the judgment of the district court is reversed insofar as it holds that Tar Heel discriminated against employees Whitlock and Dunham. In all other respects, its judgment is affirmed.
 
 
 27
 AFFIRMED IN PART;
 
 
 28
 REVERSED IN PART.
 
 
 29
 SPROUSE, Circuit Judge, concurring in part, dissenting in part:
 
 
 30
 I concur in the majority's holding affirming the district court's finding of Tar Heel's discrimination against David Miller. I respectfully dissent, however, from the majority's holding that reverses the district court's judgment concerning David Whitlock and James Dunham.
 
 
 31
 As the majority correctly recognizes, the district court's judgment was based primarily on its findings of fact that Tar Heel discriminated against these three former employees, either by failing to promote them or by discharging them. While recognizing the high degree of deference that we must give to the factual findings of the district court, the majority opines that the district court was clearly erroneous in two of its factual findings relating to Whitlock and one essential finding concerning Dunham's discharge. I respectfully disagree.
 
 
 32
 The trial court found that from 1974 to 1977 David Whitlock sought a promotion to the position of mechanic in the maintenance department. It also found that Whitlock was qualified for the position because of his experience with running a "Ward die-cutter" and familiarity with other plant machinery. Tar Heel impermissibly discriminated against him by refusing him the promotion and instead hiring two white employees for this position during 1976-77. One of these employees, Earl Pressley, had no experience repairing Tar Heel's machines, nor in repairing any other type of machinery. The other white employee, Larry Munsen, was a recent high school graduate who had worked briefly at Tar Heel as a helper on a press. Finally, the trial court found that Tar Heel had offered no reason for its failure to promote Whitlock.
 
 
 33
 The majority concludes that Whitlock only identified being denied a job opening on May 15, 1978. In addition, it finds the evidence does not reflect the nature of this position or who was hired to fill it. However, Whitlock testified about the nature of the May 15 job opening ("a fixer working on the shed fixing the machine"), as well as the identity of the person hired ("a white stacker behind the Pressman"), although he admitted that he did not know this individual's name. Moreover, Whitlock's lack of sufficient identification about specific job openings, or who was hired to fill them, is understandable in light of the trial court's uncontested finding that Tar Heel had (1) no job descriptions, (2) no policy of posting vacancies or transfer possibilities, and (3) no other means of informing personnel of such opportunities other than informing the person hired or promoted. Thus, merely because Whitlock could not identify specific job openings does not make the trial court's finding that he sought a promotion from 1974-1977 erroneous.
 
 
 34
 I also differ with the majority's conclusion that the district court erred in finding that Whitlock was qualified for the position of mechanic. It is true he never repaired a Ward die-cutter for Tar Heel and that Tar Heel was not aware of any prior experience which he had repairing that particular machine. The trial court's findings, however, were not based solely on Whitlock's expertise, but also considered the fact that there were no stated qualifications for the mechanic's position. I feel we are precluded by Anderson v. City of Bessemer City, 470 U.S. 564 (1985), from overturning this factual conclusion in light of the district court's uncontested finding that neither white man actually hired had any experience.
 
 
 35
 In my opinion, Anderson likewise precludes overturning the trial court's finding of facts as they relate to Whitlock's discharge. The trial court found that Whitlock had been treated differently from white employees. Although Whitlock had not been suspended following his second unexcused absence, as required by company policy, he was still discharged following his third unexcused absence. In contrast, Tar Heel justified not discharging several white employees after a sixth unexcused tardy or third unexcused absence precisely because they had not been suspended following the previous incident.
 
 
 36
 The majority justifies Tar Heel's dismissal of Whitlock following his third unexcused absence because it notes that Whitlock had been warned, after his second unexcused absence, that any further unexcused absence would result in termination. Whitlock was never suspended, however, and the warning was so confusing that the trial court could well have disregarded that testimony and any affect that an alleged warning might have otherwise had.
 
 
 37
 The trial court also found that Whitlock had been treated differently because he was discharged after his third unexcused absence (on July 18, 1978), whereas two white employees, Timothy Broome and Terry McManus, had not been discharged following a third unexcused absence. Here, I disagree with the majority's view that the nature of the white employees' absences provided a nondiscriminatory reason for treating Whitlock differently. According to the majority, Tar Heel had a policy of not counting Sunday absences as unexcused absences, and that except for Sunday absences, Whitlock was not treated differently than the white employees. The evidence, however, more than adequately supports an inference that this is not correct. The enforcement particulars of this policy were at least sufficiently unclear that the trial court could have disregarded it. The Sunday absentee policy was not in writing and McManus' and Broome's attendance records comprised concrete evidence that excusing Sunday absences was not a uniform practice. For example, the Sunday absences of McManus and Broome were marked in a manner that indicated the absences were unexcused, while the Sunday absence of another employee was marked as excused. Also, in this respect, Broome was given a warning for his Sunday absence, a procedure consistent with Tar Heel's manner of treating unexcused absences.
 
 
 38
 Finally, the trial court found that Whitlock's absence the day after his third unexcused absence could not be considered a fourth unexcused absence justifying dismissal. He had presented a doctor's certificate similar to those accepted to excuse absences by white employees. Again, in the face of this evidence, I find the Supreme Court's mandate in Anderson compelling.
 
 
 39
 Likewise, I cannot agree with the majority's conclusion that the district court was clearly erroneous in finding that race was a significant cause in the discharge of James Dunham. As the majority notes, Tar Heel had a policy stating that any employee absent three consecutive days without notifying the company would be considered to have quit his or her job. The trial court, however, found that Dunham told his supervisor of his illness prior to leaving the job. This illness could not have been a great surprise to supervisory personnel since Dunham had just returned following an excused three-week absence due to a kidney infection. On this basis, the trial court felt that he need only bring a medical certificate upon his return to work since white employees routinely were excused for large periods of time provided they notified Tar Heel in advance and followed up with a medical certificate upon their return to work.
 
 
 40
 Nonetheless, the majority concludes that Dunham was still required to notify Tar Heel each day he was absent, and that since he failed to notify them for three successive days, his dismissal was proper. I cannot agree with this conclusion, especially since Dunham was discharged the day after he left work, not three days later. Likewise, I cannot agree that there was a legitimate nondiscriminatory reason for treating Dunham differently than some white employees because they telephoned in advance concerning their absences. Dunham did better than this; he personally notified his supervisor that he was ill before leaving work on April 28. Although there was some factual dispute concerning this issue, it was resolved in favor of Dunham, a credibility resolution that we can hardly disturb.
 
 
 41
 In short, I feel there was ample evidence to sustain the trial court's findings, and I would affirm them in their entirety.