Deborah FINICAL, Plaintiff,

v.

COLLECTIONS UNLIMITED, INC., an Arizona corporation, Defendant.

No. Civ97–1649–PHX–ROS.

United States District Court, D. Arizona.

Aug. 19, 1999.

Richard Moreno Martinez, Law Offices of Richard M. Martinez, Tucson, AZ, for Deborah Finical, plaintiff.

Richard K. Mahrle, Karen Gillen, Gammage & Burnham PLC, Phoenix, AZ, for Collections Unlimited, Inc., defendant.

## ORDER

SILVER, District Judge.

Plaintiff Deborah Finical, an individual with a hearing impairment, filed a Complaint on August 5, 1997 and an Amended Complaint on August 8, 1997 alleging claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* Plaintiff worked for Defendant Collections Unlimited as a telephone collector. In her Amended Complaint, interpreted with reference to two documents attached thereto and incorporated therein—her EEOC charge and the EEOC's determination—Plaintiff claims that Defendant terminated her due to her hearing impairment. Pending before the Court is Defendant's Motion for Summary Judgment on this claim.

In the Amended Complaint, Plaintiff further claims that Defendant terminated her in retaliation for her acts of requesting a reasonable accommodation and complaining when the requests were denied. As Plaintiff indicates, Defendant's Motion does not address this claim. At the hearing on the summary judgment motion on August 2, 1999, Defendant explains that it did not request summary judgment on the retaliation claim because Plaintiff, in setting forth the claim, cites 42 U.S.C. § 12112, a provision requiring the preliminary determination that the claimant is a qualified individual with a disability. The Court is uncertain whether Defendant believed the claim to be invalid because Plaintiff cited the incorrect statute or whether Defendant believed the claim was defeated by the argument that Plaintiff is not a qualified individual with a disability. As will be discussed in detail below, the Court concludes that the incorrect citation did not render the claim invalid. The Court further concludes that providing Defendant an opportunity to file a summary judgment motion on the claim would be futile because Plaintiff has set forth sufficient admissible evidence to create genuine issues of material fact with respect to this claim.

## DISCUSSION

A motion for summary judgment may be granted if the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). To defeat the motion, the non-moving party must show that there are genuine factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The Court views the evidence in the light most favorable to the nonmoving party and draws any reasonable inferences in the nonmoving party's favor. *Warren v. City of Carlsbad,* 58 F.3d 439, 443 (9th Cir. 1995), *cert. denied,* 516 U.S. 1171, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996).

### I. Claim of Termination Due to Hearing Impairment

To survive a motion for summary judgment on her claim of termination due to her hearing impairment, Plaintiff must establish a genuine issue of material fact regarding the following elements: (1) she has a disability as defined by the ADA; (2) she can perform essential job functions either with or without a reasonable accommodation; and (3) she was terminated because of her disability. *Kennedy v. Applause,* 90 F.3d 1477, 1481 (9th Cir.1996) (internal quotation omitted). Defendant argues that Plaintiff has failed to offer evidence sufficient for a reasonable jury to

conclude that she has satisfied the first and third elements set forth. The Court will consider each in turn.

## A. Does Plaintiff Have a "Disability" as Defined by the ADA?

The ADA proscribes "discriminat[ion] against a qualified individual with a disability because of the disability of such individual in regard to ... discharge." 42 U.S.C. § 12112(a). Defendant argues that Plaintiff does not have a disability as defined by the ADA. The statute defines the term "disability" as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). Defendant does not dispute that Plaintiff's hearing loss is a "physical ... impairment" or that hearing is a "major life activit[y]." *Id.* Rather, Defendant argues that Plaintiff's impairment, evaluated in light of the mitigating measures she employs, is not one that "substantially limits" her hearing. *Id.*

At the time the parties filed the pending pleadings, the Ninth Circuit had concluded that mitigating measures cannot be considered in determining whether an individual is disabled as defined by the ADA. *See Holihan v. Lucky Stores, Inc.,* 87 F.3d 362, 366 (9th Cir.1996) (citing 29 C.F.R. § 1630.2(h) (App.)), *cert. denied,* 520 U.S. 1162, 117 S.Ct. 1349, 137 L.Ed.2d 506 (1997). However, after these pleadings were filed, the Supreme Court issued three decisions holding that "the determination of whether an individual is disabled [under the ADA] should be made with reference to measures that mitigate the individual's impairment." [1] *Sutton v. United Airlines, Inc.* — U.S. —, 119 S.Ct. 2139, 2143, 144 L.Ed.2d 450, — (1999). *See also Albertsons, Inc. v. Kirkingburg,* — U.S. —, 119 S.Ct. 2162, 144

L.Ed.2d 518 (1999); *Murphy v. United Parcel Svc., Inc.,* — U.S. —, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999).

The factual background of each of these cases illustrates the range of mitigating measures that must be considered. In *Sutton,* each of the two plaintiffs, who were twin sisters, had uncorrected vision of 20/200 or worse in the right eye and 20/400 or worse in the left eye. — U.S. at —, 119 S.Ct. at 2143. However, with the use of corrective lenses, each had vision of $20/20$ or better and therefore could function identically to individuals without a vision impairment. *Id.* Taking into account the corrective lenses, the Court determined that the plaintiffs' impairment did not substantially limit a major life activity and thus the plaintiffs did not have a disability for purposes of the ADA. *Id.* at 2149. In *Murphy,* the plaintiff had extremely high blood pressure of approximately 250/160 when unmedicated. — U.S. at —, 119 S.Ct. at 2136. However, when he took medication, his blood pressure was measured at 160/102 and 164/104. *Id.* With medication, the plaintiff functioned normally with the exception of limitations on his ability to lift heavy objects. *Id.* at 2137. Evaluating this plaintiff's condition in light of the corrective measure of blood pressure medication, the Court concluded that his impairment likewise did not substantially limit a major life activity. Thus, the plaintiff was not disabled for purposes of the ADA. *Id.* at 2137.

The third action, *Albertsons,* involved a plaintiff with 20/200 vision in one eye, i.e., one who had essentially monocular vision. — U.S. at — – —, 119 S.Ct. at 2165–66. The record indicated that the plaintiff's brain had developed methods of compensating for his disability, including "subconscious adjustments to the manner in which he sensed depth and perceived peripheral objects." *Id.* at 2168–69. Extending the range of mitigating measures that must be considered, the Supreme

---

1. Following these decisions, this Court ordered the parties to file supplemental pleadings addressing the affect of these decisions on the instant action.

Court held that, in addition to artificial aids such as corrective devices and medication, courts must consider the individual's physical ability to compensate for the impairment suffered. *Id.* As a result, the Court reversed a Ninth Circuit decision concluding that monocular vision constitutes a disability *per se* and held that the plaintiff's ability to make subconscious physical adjustments must be considered before a disability determination can be made. *Id.*

In the lead case of this trio, *Sutton,* the Supreme Court set forth three reasons for concluding that mitigating measures must be considered in determining whether individuals are disabled under the ADA. First, the ADA definition of "disability", "a physical or mental impairment that substantially limits one or more of the major life activities" of an individual, appears in the present indicative verb form. *Sutton,* — U.S. at ——, 119 S.Ct. at 2146 (quoting 42 U.S.C. § 12102(2)). According to the Court, "th[is] language is properly read as requiring that a person be presently—not potentially or hypothetically—substantially limited in order to demonstrate a disability." *Id.* Second, the Court concluded that, by requiring analysis of whether an impairment substantially limits a major life activity "of such individual", the statutory language requires an individualized inquiry rather than an inquiry treating the individual as a member of a group with similar impairments. *Id.* at 2147 (quoting 42 U.S.C. § 12102(2)). Concomitantly, judging individuals in their uncorrected or unmitigated state runs counter to an individualized inquiry because it requires speculation about how an impairment in its uncorrected state usually affects individuals. *Id.*

For its third reason, the Supreme Court relied heavily on a finding by Congress that "some 43,000,000 Americans have one or more physical or mental disabilities, and this number is increasing as the population as a whole is growing older." *Id.* (quoting

42 U.S.C. § 12101(a)(1)). Setting forth statistics obtained from studies conducted by the National Council on Disability, the Court concluded that this figure reflected individuals with functional limitations on their ability to perform certain basic life activities. *Id.* at 2147–48. In contrast, the Supreme Court noted, definitions of disability based on nonfunctional approaches produced significantly larger numbers. *Id.* at 2148. For example, approximately 100 million individuals have vision impairments, 28 million have hearing impairments, and 50 million have high blood pressure. *Id.* at 2149 (citations and quotations omitted). The Supreme Court concluded that defining all of these individuals as disabled under the ADA would extend the coverage of the statute to many individuals whom Congress never intended to encompass. *See id.*

■ In its supplemental pleading, Defendant asserts that, when mitigating measures are considered, Plaintiff does not have a disability as defined by the ADA. For support, Defendant cites the deposition testimony of Plaintiff's expert witness, Dr. Jerold Olson, the head of otolaryngology at the University of Arizona,[2] who states, "I think that [Plaintiff] would benefit from hearing aids." (Olson Dep. at 28, Exh. 12 to Pl's Stmt. of Facts ("PSOF")). Defendant's argument is flawed because, regardless of Olson's opinion that she would benefit from the use of hearing aids, Plaintiff does not use them. At some point in the past, Plaintiff tried using hearing aids for a month but stopped upon discovering that they picked up background noise she found annoying. (Pl.'s Dep. at 12, Exh. 8 to PSOF).

At the hearing on the summary judgment motion, Defendant argued that evaluating Plaintiff's impairment without considering Dr. Olson's opinion about hearing aids would be akin to evaluating the plaintiffs in *Sutton* without their glasses. This

---

**2.** Otolaryngology pertains to medical and surgical treatment of disorders of the head and neck, including ear, nose, and throat surgery.

(Olson Dep. at 4, Exh. 12 to Pl.'s Stmt. of Facts).

argument fails because the Supreme Court requires a case-by-case analysis of the limitations an individual faces in his or her current state. *See Sutton,* —— U.S. at ——, 119 S.Ct. at 2147. As explained above, an individualized inquiry into the limitations faced by a claimant who uses corrective devices is inconsistent with an evaluation focusing on the limitations the claimant would face in an uncorrected state. *Id.* Likewise, an individualized inquiry into the limitations faced by a claimant who does not use corrective devices is inconsistent with an evaluation focusing on the limitations the claimant would face in a corrected state. Both approaches frequently require speculation——with respect to the latter, speculation about the limitations a plaintiff would face if she used a corrective measure she presently does not use,[3] and, with respect to the former, speculation about the limitations a plaintiff would face if she stopped using a corrective measure she presently uses. Neither approach assesses the limitations the individual actually faces in the present.

■■■ For similar reasons, *Plaintiff is correct in asserting that the accommodation she sought from her employer, a telephone with a headset providing amplification of conversation, cannot itself be considered a mitigating measure.* As Plaintiff points out, the headset with amplification was not available to Plaintiff at the time she was terminated from her position. Therefore, it would violate the approach required by the Supreme Court, analysis of the limitations an individual presently faces, to consider a corrective device that was unavailable to the Plaintiff. Of greater importance, the mitigating measures or devices that must be considered are those employed by the individual claimant, such as hearing aids or blood pressure medication, not those provided by, and within the control of, the employer.[4] *See Sutton,* —— U.S. at ——, 119 S.Ct. at 2143; *Murphy,* —— U.S. at ——, 119 S.Ct. at 2137.

■■■ In its supplemental pleading, Defendant raises the argument that Plaintiff is not disabled because she can "perform everyday activit[ies] that an everyday person does". According to Defendant, Plaintiff "drives a car, watches television, goes to the movies, talks with people, worked in an office, serves on school committees and cares for her children just as any average person would." (Def.'s Mot. for Summ.J. at 5; *see* Pl.'s Dep. at 19–20). However, Defendant is considering Plaintiffs' ability to perform a range of activities far broader than the range that should be considered in determining whether Plaintiff has a disability under the ADA. Defendant does so because it relies on the above-quoted provision, which suggests that the disability inquiry focuses on whether Plaintiff can perform "everyday activit[ies] that an everyday person does". Although Defendant quotes *Murphy* for this provision, the Supreme Court explained that the quoted language originated in a doctor's testimony on which the Tenth Circuit had relied in the decision below. *See Murphy,* —— U.S. at ——, 119 S.Ct. at 2137. The Supreme Court did not rely upon the quoted language as the standard for assessing whether an impairment substantially limits a major life activity.

3. Dr. Olson's deposition testimony that Plaintiff would benefit from hearing aids does not eliminate the necessity for speculation because he does not explain how she would benefit or whether her hearing would improve.

4. At the hearing, Defendant agreed that the telephone headset could not be considered as a mitigating measure. As Defendant argued, the measures an employer provides are relevant not to the threshold analysis of whether an individual is disabled, but only to the subsequent analysis of whether an employer provided a reasonable accommodation. To conclude otherwise would lead to the anomalous result that an employer could potentially provide a reasonable accommodation and then terminate the individual, arguing that, due to the use of the reasonable accommodation, the individual is not disabled under the ADA and therefore not entitled to the protections the statute provides.

■ Examination of the Supreme Court's decisions in *Sutton* and *Kirkingburg* enable this Court to determine the nature and extent of activities that should be considered in determining whether an individual's impairment is substantially limiting. In *Sutton*, the dissent argued that evaluating individuals in their corrected state will exclude from the category of "disabled" those individuals who use prosthetic devices after losing a limb. *See Sutton*, —— U.S. at ——, 119 S.Ct. at 2149 (citing dissents of Stevens and Breyer, JJ.) In response, the majority stated:

> [I]ndividuals who use prosthetic limbs or wheelchairs may be mobile and capable of functioning in society but still be disabled because of a substantial limitation on their ability to walk or run. The same may be true of individuals who take medicine lessen the symptoms of an impairment so that they can function but nevertheless remain substantially limited.

*Id.* By stating that the appropriate inquiry is not whether an individual using a prosthetic limb or wheelchair is "mobile and capable of functioning," but whether the individual can "walk or run", the Supreme Court indicates that, to determine whether an individual is disabled, the only activity that should be considered is the very major life activity alleged to be substantially limited. In the instant action, that activity is hearing.

A useful illustration is supplied by building upon the example provided by the Supreme Court. An individual who uses a wheelchair, a prosthetic device, or even crutches in place of a missing limb may be able to conduct a great deal of "everyday activities" like an "everyday person", including; performing highly-skilled work; engaging in outdoor activities such as hiking, camping, and skiing; participating in sports; attending events including movies, concerts, and sporting events; maintaining a home; cooking; and maintaining close relationships with family and friends. A number of these activities may even extend beyond the range typically performed by "everyday people". Nonetheless, this highly-functional individual's impairment, loss of a limb, generally will continue to substantially limit the major life activity of walking or running and thus the individual, albeit highly functional, will remain a disabled individual entitled to the protections the ADA accords.

The Supreme Court's decision in *Kirkingburg* is in accord. In determining whether a monocular person was disabled, the Supreme Court explained that the relevant analysis was whether he was substantially limited in the major life activity of seeing due to factors such as loss of depth perception and visual field. *See Kirkingburg*, —— U.S. at —— – ——, 119 S.Ct. at 2168–69. The Court did not instruct the lower courts to consider whether the plaintiff could perform life activities that, though indicative of high functional capacity, or, at minimum, of ability to perform "everyday activities" like an "everyday person", are unrelated to the major life activity of seeing. In accordance with the Supreme Court's analysis, a blind person who utilizes braille, a seeing-eye dog, and a cane may be highly functional but remain substantially limited in the major life activity of seeing.

The conclusion that the inquiry into disability remains focused on the major life activity at issue accords not only with the Supreme Court's analysis but with the text of the ADA. The statute expressly requires analysis of whether an impairment substantially limits a major life activity, not whether the individual is highly functional as a general matter. *See* 42 U.S.C. § 12102(2). To conclude otherwise would eviscerate the ADA by excluding from coverage all individuals who, though possessing an impairment substantially limiting a major life activity, remain highly-functional overall. Such an interpretation would render the ADA inapplicable to those individuals most likely to have the capacity to perform various jobs capably if provided with reasonable accommodations.

■ Because the analysis of disability focuses on the major life activity alleged to

be substantially limited, the relevant mitigating measures are those that affect the claimant's ability to perform that major life activity. *See Kirkingburg,* —— U.S. at —— ––——, 119 S.Ct. at 2168–69. For example, in *Kirkingburg,* the Court indicated that corrective devices, including coping mechanisms developed by the individual's own brain, are to be considered to the extent that they affect the individual's ability to perform the major life activity of seeing by, for example, adjusting the manner in which the individual senses depth and perceives peripheral objects. *See id.* In contrast, the brain may compensate for lack of vision in other ways, such as by making the affected individual's hearing more acute, but this compensatory measure does not improve the individual's ability to see and should not be considered in determining whether the individual is substantially limited in the major life activity of seeing.

██ Finally, Defendant argues at length that those cases in which courts have found hearing impairments to be a disability involved hearing losses greater than that suffered by Plaintiff. Assuming Defendant's characterization to be accurate, a comparison of Plaintiff's hearing loss to that suffered by others is inconsistent with the Supreme Court's requirement that the analysis of whether an impairment substantially limits a major life activity be made on a case-by-case basis. *See Sutton,* —— U.S. at ——, 119 S.Ct. at 2147. Merely because courts have found hearing losses of a greater degree to be disabilities does not establish as a matter of law that Plaintiff's hearing loss does not constitute a disability. None of the cases Defendant cites contain an analysis of the minimum

hearing loss that individuals must sustain to have a disability as defined by the ADA.

The Court proceeds to determine whether Plaintiff satisfies the burden of creating a genuine issue of material fact with respect to whether her impairment "substantially limits" the major life activity of hearing. To satisfy her burden, Plaintiff offers the deposition testimony of otolaryngologist Dr. Jerold Olson. (Olson Dep. at 4). Dr. Olson examined Plaintiff to evaluate her hearing and render an opinion about the degree of her disability. (*Id.* at 7). He obtained the Plaintiff's history, conducted a physical examination of her, and had an audiogram performed. (*Id.* at 7, 11). For the audiogram, the patient sits in a sound proof booth while an audiologist sends a series of tones, varying by decibel (loudness) and frequency (pitch), to the party's headset one ear at a time. (*Id.* at 12–13). When the patient can hear a tone, he or she so indicates by raising a hand or pressing a button. (*Id.* at 13).[5]

Based on his examination and the audiogram, Dr. Olson concluded that Plaintiff has "a mild to moderate" hearing loss that is "[m]ost prominent in the low to mid frequencies." (Olson Report at 1, Exh. 1 to Olson Dep.) The audiogram results indicated that, at a low frequency or pitch of 500 hertz, at which a person with normal hearing could hear a tone at 20 decibels or less, Plaintiff could hear a tone only when amplified to 45 decibels in her right ear and 55 decibels in her left ear. (Olson Dep. at 16–17). Referring to a chart plotting the results of Plaintiff's audiogram, Dr. Olson concluded that Plaintiff "misses" about 37 percent of what Defendant's counsel describes as "normal speech". (*Id.* at 28–29 and Exh. 2 attached thereto).

---

5. Dr. Olson also ordered an otoacoustic emissions test. This test involves placing a small probe and microphone in the patient's ear canals to measure the inner ear's response to various tones emitted by the probe. (Olson Dep. at 13–14). A formula is then employed to compare the responses to norms in order to establish the patient's hearing level. (*Id.* at 14). Because this test does not rely upon the patient's cooperation, it eliminates any question about a patient faking a hearing loss. (*Id.*) However, in response to a question about what the test results told him, Dr. Olson said, "It does not really give me any information to be honest." (Olson Dep. at 24). The following page of the deposition is not in the record and thus it is unclear why the test results did not give Dr. Olson any information.

Interpreting another chart, Dr. Olson concluded that, at "normal speech" levels, the sounds "being missed" by Plaintiff include approximately half of the vowel sounds. (*Id.* at 30 and Exh. 3 attached thereto). Dr. Olson further opined that Plaintiff would have difficulty hearing in either a setting in which more than one person is speaking at a time or any setting with a great deal of background noise. (*Id.* at 32).

Plaintiff employs several measures to compensate for this hearing loss. As one measure, Plaintiff makes other people aware of her hearing loss. When she was a student, she informed teachers of her hearing loss and asked questions if she did not understanding something. (Pl.'s. Dep. at 16). Similarly, Plaintiff's former coworkers aver that Plaintiff informed them of her hearing loss. (Aff. of Bonnie Montonaro Aff. at ¶ 11, Exh. 11 to PSOF; Aff. of Adelina Yolanda Ortiz at ¶ 7, Exh. 13 to PSOF). At the hearing on the motion for summary judgment, Plaintiff's counsel explained that Plaintiff also engages in lip-reading. Plaintiffs deposition testimony provides confirmation. When Plaintiff was in school, she sat at the front of her classes and focused on the teachers when they spoke. (Pl.'s Dep. at 16). The measures she employed while working for Defendant were similar. Plaintiff asked coworkers to face her directly when speaking to her and explained that she could not hear people speaking behind her. (*Id.* at 99; Aff. of Barbara J. Winterberg at ¶ 13, Exh. 15 to PSOF). Plaintiff employs additional compensatory measures in her home, including: a red light on the telephone that goes on when the phone is ringing and a volume control device on the phone to increase amplification. (Pl.'s Dep. at 20). Her dog barks when someone is at the door. (*Id.* at 17).

As explained previously, in considering compensatory measures, the inquiry remains focused on the impact of the measures on Plaintiff's ability to hear, the major life activity at issue, rather than on her general ability to engage in "normal activities" like a "normal person." *See* *Sutton,* — U.S. at —, 119 S.Ct. at 2149; *Kirkingburg,* — U.S. at —, 119 S.Ct. at 2169. Measures such as lip-reading and telephone lights improve Plaintiff's ability to communicate despite a hearing impairment and, as a result, her ability to engage in normal activities. However, these measures do not necessarily improve Plaintiff's ability to hear. Lip-reading is unlike the use of corrective lenses at issue in *Sutton,* because the lenses actually improved the pilot applicants' ability to see. For the same reasons, lip-reading is even unlike corrective measures taken by the body to improve the ability of a person with monocular vision to see both range and depth, at issue in *Kirkingburg.* In the latter situation, the brain improves the ability to perform the major life activity of seeing, rather than compensating for an inability to see by, for instance, making another of the senses such as hearing more acute.

In contrast to a corrective device that would actually improve an individual's ability to hear, lip-reading is a means by which an individual whose hearing is impaired may obtain information visually rather than orally. Thus, lip-reading is more akin to use of a wheelchair or braille—all are devices that assist an impaired individual to remain functional, even highly so, but do not alter the status of the impairment. Just as a wheelchair-bound individual may be mobile while substantially limited in the ability to walk, Plaintiff may be able to obtain information from a speaker via lip-reading while remaining substantially limited in her ability to hear.

Another measure the Plaintiff employs actually improves her ability to hear—the amplification device on Plaintiff's home telephone enables her to hear more of what her caller is saying. It is unclear whether the other measures, sitting in front of classes and asking people to face her while speaking, improve Plaintiff's hearing or only compensate for Plaintiff's loss of hearing. Construed in the light most favorable to Plaintiff, these measures appear to do both. By sitting in the front

of her classes, Plaintiff was closer to her teachers, thereby allowing her both to hear more of what they said and to see them better for purposes of lip-reading. Likewise, Plaintiff's request to coworkers, to face her while speaking, is a means of enabling the Plaintiff to both hear and see her coworkers better.

In determining whether Plaintiff creates a genuine issue of material fact with respect to whether her impairment "substantially limits" the "major life activit[y]" of hearing, the Court relies upon EEOC regulations interpreting the term "substantially limits". The Supreme Court has assumed, without deciding, that these regulations are reasonable. *Sutton*, —— U.S. at ——, 119 S.Ct. at 2151. The Ninth Circuit consistently relies upon these regulations as well. *See Summers v. A. Teichert & Son, Inc.*, 127 F.3d 1150, 1153 (9th Cir.1997); *Thompson v. Holy Family Hosp.*, 121 F.3d 537, 539–40 (9th Cir.1997) (*per curiam*). The EEOC regulations define the phrase "substantially limits" to mean:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). The regulations further instruct courts to consider the following three factors to determine whether an impairment "substantially limits" an individual's "major life activities:

(i) The nature and severity of the impairment;

(ii) The duration or expected duration of the impairment; and

(iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment."

29 C.F.R. § 1630.2(j)(2).

Construed in the light most favorable to Plaintiff, the nonmoving party, the evidence regarding both the extent of Plaintiff's hearing loss and the compensatory measures she employs creates a genuine issue of material fact with respect to whether Plaintiff's impairment "substantially limits" the "major life activit[y]" of hearing. Plaintiff has a hearing impairment that causes her to miss 37 percent of speech at normal levels, including over half of the vowel sounds. The duration of the hearing loss is permanent. A reasonable jury could conclude that, even when the compensatory measures are considered, Plaintiff's hearing impairment remains at or near this level because these measures largely allow Plaintiff to compensate for the impairment through visual means such as lip-reading, rather than correct or improve Plaintiff's ability to hear. Considering this loss in terms of severity, impact and duration, factors listed in 29 C.F.R. § 1630.2(j)(2)(i)–(iii) to assist in determining whether an impairment is substantially limiting, a reasonable jury could conclude that Plaintiff is substantially limited in the major life activity of hearing.

In addition to the factors set forth in the regulations and applied above, one of the definitions of "substantially limits" contained in the regulations also provides a basis upon which a reasonable jury could conclude that Plaintiff's impairment substantially limits the major life activity of hearing. Given the combination of the level of Plaintiff's hearing loss and the corrective measures she utilizes, including amplification, a reasonable jury could conclude that she is "significantly restricted as to the condition, manner or duration under which [she] can [hear] as compared to the condition, manner, or duration under which the average person in the general population can [hear]." 29 C.F.R. § 1630.2(j)(1). This conclusion is further bolstered by evidence of situations in

which it is particularly difficult for Plaintiff to hear even with the compensatory measures she employs—situations involving a great deal of background noise, such as crowds or offices in which multiple people are speaking. (Pl.'s Dep. at 20; Olson Dep. at 31–32). Because Plaintiff has submitted evidence from which a reasonable jury could conclude that she is substantially limited in the major life activity of hearing, Defendant fails in requesting summary judgment on the basis that Plaintiff is not a qualified individual with a disability.

■ In her Response, Plaintiff also suggests that her impairment substantially limits the major life activity of working. Specifically, she argues that her impairment precludes her from obtaining an entire class of jobs or at least makes obtaining those jobs difficult. Working is a residual life activity, considered only as a last resort. *Sutton,* —— U.S. at ——, 119 S.Ct. at 2151 (citing 29 C.F.R. pt. 1630, App. § 1630.2(j)). When working is the major life activity at issue, EEOC regulations provide:

> The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i). Thus, to establish a substantial limitation on the major life activity of working, a plaintiff must establish that she is unable to work in a broad class of jobs. *Sutton,* —— U.S. at ——, 119 S.Ct. at 2151. The regulations contain several additional factors to consider, including the geographical area to which the individual has reasonable access and "the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified." 29 C.F.R. § 1630.2(j)(3)(ii)(A), (B).

■ Applying these standards, Plaintiff has not created a genuine issue of material fact regarding whether her hearing impairment limits the major life activity of working. She cites only regulations promulgated by the Department of Transportation stating that a person is "physically qualified" to drive if she "does not have an average hearing loss in the better ear greater than 40 decibels at 500 Hz, 1000 Hz, and 2000 Hz with or without a hearing aid.," 49 C.F.R. § 391.41(b)(11), as well as a Third Circuit decision involving regulations applicable to school bus drivers, *Strathie v. Department of Transp.,* 716 F.2d 227 (3rd Cir.1983). Plaintiff offers no evidence regarding "the number and types of jobs utilizing similar training, knowledge, skills or abilities, within [her] geographical area, from which [she] is also disqualified." *See* 29 C.F.R. § 1630.2(j)(3)(ii)(A), (B).

■ Finally, Plaintiff argues that she is disabled under the ADA because Defendant "regarded [her] as having ... an impairment [that substantially limits a major life activity]". 42 U.S.C. § 12102(2). Plaintiff can satisfy this standard by establishing either that (1) Defendant mistakenly believed that she had an impairment that substantially limits a major life activity, or (2) Defendant believed that an actual, nonlimiting impairment substantially limits a major life activity. *Sutton,* —— U.S. at —— ——, 119 S.Ct. at 2149–50.

■ Plaintiff argues that Defendant understood the limitations imposed by her hearing impairment. For support, she cites deposition testimony indicating that she made Defendant's management aware of her impairment from the time she first inquired about the job by repeatedly requesting reasonable accommodations. In addition, certain managers also relayed information about her impairment to other managers. (Pl.'s Dep. at 37, 80, 93, 99, 102; Logvin Dep. at 34–37, 42–43, 45–46, Exh. 10 to PSOF; Montonaro Aff. at ¶ 9; Ortiz Aff. at ¶ 13). Construed in the light most favorable to Plaintiff, this evidence establishes that Defendant was aware of

her impairment; however, it does not establish that Defendant believed that the impairment substantially limited the major life activity of hearing, or any other major life activity. Therefore, Plaintiff has not set forth evidence sufficient to survive summary judgment on the issue of whether Defendant regarded her as disabled.

### B. Did Defendant terminate Plaintiff because of her disability?

As stated previously, the third element a Plaintiff must establish to prevail on an ADA claim is that she was terminated because of her disability. *Kennedy*, 90 F.3d at 1481. The evidence pertaining to this element is analyzed in the framework of the shifting burdens of production employed in Title VII actions. To begin, a defendant in an ADA action, like a defendant in an action pursuant to Title VII or the Age Discrimination in Employment Act ("ADEA"), can offer evidence showing that, rather than taking adverse action against a plaintiff because of his or her disability, the defendant acted for one or more legitimate, nondiscriminatory reasons. *See Collings v. Longview Fibre Co.*, 63 F.3d 828, 833–34 (9th Cir.1995), *cert. denied*, 516 U.S. 1048, 116 S.Ct. 711, 133 L.Ed.2d 666 (1996); *Evans v. Runyon*, 965 F.Supp. 1388, 1389 (C.D.Cal.1997). In accordance with this standard, Defendant argues that it possessed legitimate, nondiscriminatory reasons for terminating Plaintiff.

 William Cherek, one of the owners of Defendant, made the decision to terminate Plaintiff. In his deposition testimony, Cherek avers that, in early 1994, he became concerned about whether Plaintiff was a "team player" upon learning from supervisor Lori Nowel that Plaintiff had voiced criticisms about the company and her immediate supervisor to her coworkers. (Cherek Dep. at 124, Exh. B to Def.'s Stmt. of Facts ("DSOF")). According to Cherek, Plaintiff criticized her supervisor

for going on a vacation without informing her and criticized the company for advertising an open position without informing her and giving her the opportunity to apply. (*Id.* at 124–25). Cherek considered Plaintiff's behavior to be disruptive of the workplace. (*Id.* at 124–25). To address the situation, Cherek and Nowel met with Plaintiff on February 3, 1994 and instructed her to take criticisms directly to the individual involved rather than discussing the criticisms publicly with coworkers. (*Id.* at 125–26, and memo of Feb. 3, 1994, attached thereto as Exh. 9). Cherek also informed her that, should her behavior persist, she would be terminated. (Memo of Feb. 3, 1994, Exh. 9 to Cherek Dep.)

Eight days later, on February 11, 1994, Cherek avers, Plaintiff's coworker Tony Bianco entered Cherek's office and informed him of the following: "I was walking in from lunch when [Plaintiff] was leaving in her car, approaching me. She drove quickly and came close enough to me that I had to move quickly out of her way to avoid her. I saw that she was laughing as she did this also." (Cherek Dep. at 128; Memo attached thereto as Exh. 9). Cherek dictated this statement and had it typed into a memo; Bianco then signed it. (Cherek Dep. at 128; Memo attached thereto as Exh. 9). Cherek avers that Bianco was close to tears, ashen in color, trembling visibly, and talking very rapidly. (Cherek Dep. at 142–43).

Cherek avers that, on either the same day or the next day, he met with Plaintiff and her direct supervisor, Mr. Ed Scola.[6] Cherek avers that he began the meeting by stating that Plaintiff was "having some problems ... getting along with people." (Cherek Dep. at 138). He proceeded to ask, "How do we go about fixing this?" (*Id.*) According to Cherek, Plaintiff responded, "They're all picking on me. This isn't my fault. I'm all right and they're all

---

6. The memo regarding the Bianco incident is dated February 11, 1994, and the memo regarding Plaintiff's termination is dated February 12, 1994. (*See* Exh. 10, attached to

Cherek Dep.) However, Cherek avers that the incident and termination occurred on the same day, and believes that he dated one of the two items incorrectly. (*Id.* at 134–35).

wrong." (*Id.* at 138–39). Based on this response, Cherek decided that further attempts to discuss the issue with Plaintiff would be futile. (*Id.* at 139). He explains:

> [Following] the response that said those people are all wrong and I'm right, I thought to myself, there is no way I'm going to get this woman to work in an environment and get anything done. She's better off to go somewhere else where she can work in a different environment. There was no point in going any further, and I didn't go any further based upon that reason.

(*Id.* at 140). As a result, less than ten minutes after the meeting had begun, Cherek informed Plaintiff that he had decided to terminate her. (*Id.* at 137–139).

Because Cherek had already made this decision, he found it unnecessary to ask Plaintiff about the incident in the parking lot with Bianco though he had originally intended to raise it. (*Id.* at 138–39). However, Plaintiff saw the memo about the incident on Cherek's desk and raised the issue herself, denying that it had occurred. (*Id.* at 139). Cherek avers that the "[c]onversation started getting out of hand." (*Id.*) He informed Plaintiff that the issue of the incident involving Bianco "[was not] that serious," and that, should prospective employers make inquiries, Defendant would only verify the dates of her employment. (*Id.*) At that point, Cherek left the room and Scola remained to discuss necessary paperwork and obtain Plaintiff's signature. (*Id.* at 137, 140).

■■■■ Plaintiff asserts that Defendant's alleged legitimate nondiscriminatory reasons for terminating her were merely a pretext for disability discrimination. A plaintiff in an ADA action, like a plaintiff in an action pursuant to Title VII or the ADEA, can offer evidence that the defendant's purported legitimate, nondiscriminatory reason for taking adverse action is a pretext for discrimination. *See Collings,* 63 F.3d at 833–34; *Evans,* 965 F.Supp. at 1389. Pretext may be established " 'either directly by persuading the court that a discriminatory reason more likely motivat-

ed the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' " *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1220 (9th Cir.1998) (quoting *Texas Dep't. of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981)). "[V]ery little" direct evidence of discriminatory motive is necessary to create a triable issue of an employer's intent to discriminate. *Id.* However, indirect evidence must be "specific" and "substantial" to create a triable issue of intent. *Id.*

Construed in the light most favorable to Plaintiff, the non-moving party, the evidence is as follows. Before Plaintiff even began working for Defendant, she spoke with Cherek by telephone about her hearing impairment to confirm that Defendant would be able to provide an accommodation. (Pl.'s Dep. at 36–37). Cherek assured her that the company would provide her a telephone headset with amplification. (*Id.* at 37). During her interview at the workplace with Mr. Arnold Logvin, the production manager responsible for day-to-day operation of the collections office, Plaintiff once again sought to confirm that an accommodation would be available. (*See* Pl.'s Dep. at 60; Logvin Dep. at 16, 34–35). Logvin showed her the telephone headset. (Pl.'s Dep. at 60).

When Plaintiff began working for Defendant, she reported directly to Mr. Logvin. (*Id.* at 60, 66–67; Logvin Dep. at 16). Defendant initially provided Plaintiff a telephone headset equipped with volume control for amplification. (Pl.'s Dep. at 80). During a time in which Logvin either supervised Plaintiff directly or supervised Plaintiff's unit supervisor, Plaintiff also asked Logvin to place her at a desk positioned so that her left ear, in which her hearing was better, would be pointed away from the noisier area of the room. (*Id.* at 76, 82). Logvin did so. (*Id.* at 82).

Despite the accommodations provided by Logvin, Plaintiff's situation worsened after Defendant arranged the collectors

into units reporting to supervisors, who, in turn, reported to Logvin. (*Id.* at 73). Plaintiff's first unit supervisor was Cheryl Harvill. (*Id.*) After learning of Plaintiff's hearing impairment, Harvill made remarks tending to show bias toward the hearing impaired, remarks such as, "Clean out your ears" and "Anybody home?" (*Id.*) Another employee also heard these remarks. (*See* Montonaro Aff. at ¶ 23)

While reporting to Harvill, Plaintiff also learned that the company would be installing a new telephone system. Plaintiff asked Logvin if the new system would possess a means of providing a reasonable accommodation for her hearing impairment. (*Id.* at 80). After investigating the situation, Logvin informed Plaintiff that she would be assigned one of the headsets ordered with the new system. (*Id.*) However, when the headsets for the new system arrived, Plaintiff did not get one; rather, Harvill, two other unit supervisors, and one other employee obtained them instead. (*Id.* at 90; Scola Dep. at 29, Exh. 14 to PSOF). Plaintiff apparently attempted to use one of the old headsets but it did not provide adequate amplification on the new system. (Logvin Dep. at 80).

Plaintiff complained to Logvin about not receiving a new headset, whereupon the latter stated that he would once again investigate the situation and get back with her. (Pl.'s Dep. at 91). Logvin spoke with Cherek about getting Plaintiff a headset; however, Cherek told him not to bother. (Logvin Dep. at 43). Cherek added that the headsets were being ordered in increments of four due to their expense and provided to the employees based on seniority. Thus, he explained, Plaintiff, who apparently lacked seniority, would have to wait for hers. (*Id.* at 43–44, 79). Cherek also instructed Logvin "to tell Ms. Finical to use [the old] headset and stop complaining." (*Id.* at 79).

Plaintiff also discussed the problem with Harvill on more than one occasion, explaining that lack of a new headset interfered with her ability to do her job. (Pl.'s Dep. at 93). Harvill replied that the initial headset had been assigned to her (Harvill) and that a headset would be assigned to Plaintiff at some point in the future. (*Id.*) Plaintiff worked without a new headset during the entire summer of 1993. (*Id.*) Thereafter she obtained a new headset briefly, but, when she was transferred to Ed Scola's unit, Harvill informed her that she could not take the new headset with her. (*Id.* at 98). Scola also refused Plaintiff's request to move her desk sideways to reduce the hallway noise to which she was exposed. (*Id.* at 102–103).

Eventually Plaintiff approached Mr. Logvin again, in tears, because she was frustrated about her inability to hear. (Logvin Dep. at 81). She informed Logvin that she felt she could not do her job due to the noise distractions and lack of a usable headset. (*Id.*) Given these circumstances, Plaintiff feared that she might be terminated for nonperformance. (*Id.*) Logvin indicates that, after he spoke with Cherek on several more occasions about the situation, "[Cherek] did state he was tired of [Plaintiff] complaining and told me she'd better 'shut up and do her job' or we need to document these indiscretions for possible future termination." (*Id.* at 82–83 (quoting written statement)).

In addition to offering evidence of her repeated requests for accommodation and Defendant's denial of these requests, Plaintiff also adamantly denies threatening to hit Tony Bianco with her car. (Pl.'s Aff. at ¶ 13). Plaintiff avers that she never had a verbal or physical altercation of any kind with Bianco, and never threatened him. (Pl.'s Aff. at ¶¶ 11–12). Plaintiff's counsel provided Defendant's counsel notice of Bianco's deposition on two separate occasions, but the parties were unable to locate Bianco. (*See* In Re: Scheduled Deposition of Tony Bianco, Exh. 4 to PSOF).

Scola supervised both Bianco and Plaintiff when the two employees were assigned to his unit, but Scola never saw any negative exchange between Plaintiff and Bianco. (Scola Dep. at 66). In addition, Scola never received a complaint from Bianco

about Plaintiff prior to Bianco's complaint about the incident recounted previously. (*Id.* at 67). Scola did not witness the incident and Bianco informed him that there were no other witnesses either. (*Id.* at 63). Another employee also attests that she had the opportunity to observe Plaintiff working in the same office as Bianco but never saw or heard Plaintiff threaten Bianco or even make a negative comment about him. (Montonaro Aff. at ¶ 25).

Some of the evidence Plaintiff has offered supports the claim that is not the subject of the Motion for Summary Judgment—the claim that Defendant terminated Plaintiff in retaliation for her requests for reasonable accommodation and complaints about Defendant's repeated denials of those requests. However, the evidence offered does not support Plaintiff's claim that she was terminated due to her disability. The direct evidence of Defendant's motive for terminating Plaintiff, in particular, Cherek's statements that she should stop complaining, all relate to retaliation for complaints, not to discrimination based on Plaintiff's hearing impairment. Plaintiff does not attest that Cherek, the decision-maker, or Scola, her immediate supervisor, made negative remarks about her impairment that would tend to indicate a discriminatory animus. Harvill, Plaintiff's former manager, purportedly made such remarks but Plaintiff does not establish that Harvill was involved in the termination decision or that any other nexus exist between Harvill's remarks and Plaintiff's termination.

Plaintiff's denial of the Bianco incident, and the evidence she offers in support of the denial, constitutes some indirect evidence that this incident was not Cherek's actual reason for terminating her. The purported Bianco incident precipitated the meeting in which Cherek terminated Plaintiff; thus, evidence that the incident did not occur indicates another motive for the meeting. However, Cherek states he made the decision to terminate Plaintiff during the meeting even before he discussed the Bianco incident, when Plaintiff stated that any difficulties she was having

were the fault of other employees. Because it casts doubt on only one of the grounds for Plaintiff's termination, Plaintiff's evidence challenging the purported Bianco incident is not "substantial" indirect evidence of pretext. *See Godwin,* 150 F.3d at 1220.

Plaintiff has not introduced sufficient evidence of pretext with respect to the claim that she was terminated due to her disability and thus Defendant will be granted summary judgment on this claim.

## II. Retaliatory Termination Claim

As explained above, Plaintiff's Amended Complaint contains a claim that Defendant terminated her in retaliation for requesting reasonable accommodations and complaining when the requests were denied, but this claim contains an incorrect citation to 42 U.S.C. § 12112 rather than 42 U.S.C. § 12203, the portion of the ADA proscribing retaliation. At a hearing on August 2, 1999, Defendant explained that, because Plaintiff cited the incorrect statute, it did not request summary judgment on the merits of the reprisal claim. The Court is uncertain of what the Defendant considered the effect of the incorrect citation to be.

 A complaint does not need to identify the legal theory under which a Plaintiff seeks recovery. *Crull v. GEM Ins. Co.,* 58 F.3d 1386, 1391 (9th Cir.1995) (citing *Electrical Construction & Maintenance Co. v. Maeda Pacific Corp.,* 764 F.2d 619, 623 (1985)); *McCalden v. California Library Ass'n,* 955 F.2d 1214, 1223 (9th Cir.1990), *cert. denied sub nom, Simon Wiesenthal Ctr. for Holocaust Studies v. McCalden,* 504 U.S. 957, 112 S.Ct. 2306, 119 L.Ed.2d 227 (1992). Other than a statement identifying the basis of the court's jurisdiction and a demand for judgment for the relief sought, a complaint need contain only a " 'short and plain statement of the claim showing that the pleader is entitled to relief.' " *Id.* (citing Fed.R.Civ.P. 8).

Due to these liberal pleading standards, a defendant is not entitled to summary judgment on a claim simply because the plaintiff's lawyer misconceived the proper legal theory. *Id.* Thus, when a court concluded that a state insurance law claim was preempted by ERISA, the court should have addressed the plaintiffs' argument, contained in a response to a summary judgment motion, that they were entitled to relief under ERISA. *Id.* Given that summary judgment is not warranted when a plaintiff's counsel misconceives the proper legal theory, summary judgment is even less warranted when a plaintiff's counsel correctly identifies the legal theory, reprisal, but incorrectly cites the statute on which the theory is based. Plaintiff's reprisal claim is valid despite the incorrect citation.

How to proceed with the claim remains to be determined. At the hearing on the motion for summary judgment, Plaintiff argued that, at minimum, leave to amend the Complaint to correct the statutory citation should be granted. Defendant acknowledged that leave to amend would be prejudicial only in that Defendant had not filed a summary judgment motion on the claim.

If leave to amend were necessary, it would be granted pursuant to Federal Rule of Civil Procedure 15(a), requiring that leave "shall be freely given when justice so requires". The allegations in the amended Complaint provided ample notice of the actual claim despite the incorrect statutory citation and therefore leave to amend would not prejudice the Defendant's ability to defend the claim at trial. Whether Defendant should be given the opportunity to file a second summary judgment motion poses an entirely different question. However, the Court need not resolve this question because, upon review of the material submitted by Plaintiff in response to the Motion for Summary Judgment, the Court concludes that genuine issues of material fact exist with respect to the retaliation claim.

The portion of the ADA proscribing retaliation, 42 U.S.C. § 12203(a), provides in relevant part:

No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceedings, or hearing under this chapter.

The plain language of this provision protects "any individual" who has engaged in protected activity and thus Plaintiff need not establish that she is a qualified individual with a disability in order to maintain a retaliation claim. *See Krouse v. American Sterilizer Co.,* 126 F.3d 494, 502 (3rd Cir. 1997). The employment practice Plaintiff opposed need not actually be unlawful; rather, Plaintiff's opposition need only be "based on a 'reasonable belief' that the employer has engaged in an unlawful employment practice." *Moyo v. Gomez,* 40 F.3d 982, 984 (9th Cir.1994) (quoting *EEOC v. Crown Zellerbach Corp.,* 720 F.2d 1008, 1013 (9th Cir.1983)), *cert. denied sub nom., California Dept. of Corrections v. Moyo,* 513 U.S. 1081, 115 S.Ct. 732, 130 L.Ed.2d 635 (1995).

To analyze retaliation claims under the ADA, the Ninth Circuit employs the framework used to analyze retaliation claims under Title VII. *Barnett v. U.S. Air, Inc.,* 157 F.3d 744, 753 (9th Cir.1998). To establish a prima facie case of retaliation, an ADA plaintiff must show "(1) that he or she engaged in a protected activity, (2) that he or she suffered an adverse employment decision, and (3) that there was a causal link between the protected activity and the adverse decision." *Id.* at 753–54 (citing *EEOC v. Hacienda Hotel,* 881 F.2d 1504, 1513–14 (9th Cir.1989) (analyzing Title VII retaliation claim)).

With respect to the first prong of the prima facie case, Plaintiff and several other witnesses attest that Plaintiff requested a reasonable accommodation of a telephone headset and registered com-

plaints about the Defendant's failures to provide such an accommodation. Opposition to an unlawful employment practice constitutes protected activity. *Moyo*, 40 F.3d at 984. Plaintiff's complaints about Defendant's denial of her request for reasonable accommodation fall within the category of protected opposition. *See Hacienda Hotel*, 881 F.2d at 1514 (in Title VII action, an employee's complaint about the employer's denial of a request for reasonable accommodation of a religious practice constituted protected activity).

The parties do not dispute the second prong—Plaintiff suffered the adverse employment action of termination. The third prong requires a causal connection between the protected activity and the termination. *Barnett*, 157 F.3d at 753–54. This causal connection is supplied by Logvin's deposition testimony about two statements Cherek made when Logvin approached him about providing Plaintiff a new headset, set forth in the previous section above. On the first occasion, Cherek instructed Logvin to tell Plaintiff to stop complaining. (Logvin Dep. at 79). After Logvin spoke with Cherek on several more occasions about the situation, Cherek stated that he was tired of Plaintiff's complaints and added that "she'd better 'shut up and do her job' or we need to document these indiscretions for possible future termination." (Logvin Dep. at 82–83).

Once a plaintiff has set forth evidence sufficient to establish a prima facie case of retaliatory termination in violation of the ADA, the shifting burden of production set forth above comes into effect—the defendant's burden of producing evidence of a legitimate nondiscriminatory reason for the termination and then the plaintiff's burden of proving that the proffered reason is pretextual and that the termination actually occurred in retaliation for the plaintiff's protected activity. *See Barnett*, 157 F.3d at 754.

▮ The legitimate, nondiscriminatory reasons Defendant gives for Plaintiff's termination already have been set forth, as has Plaintiff's evidence of pretext. Al-

though the pretext evidence was insufficient to create a genuine issue of material fact with respect to the termination claim, the pretext evidence is sufficient to create a genuine issue of material fact with respect to the retaliation claim. "[V]ery little" direct evidence of discriminatory motive is necessary to create a triable issue of an employer's intent to discriminate. *Godwin*, 150 F.3d at 1220. The evidence regarding Cherek's remarks to Logvin, recounted above in the analysis of the prima facie case of retaliation, constitute sufficient direct evidence that Cherek was motivated to terminate Plaintiff due to her complaints about denial of reasonable accommodation. Cherek even acknowledges that he terminated Plaintiff partially due to complaints she had voiced, though he sets forth as examples only Plaintiff's complaints about two matters unrelated to her requests for reasonable accommodation. (*See* Cherek Dep. at 124–26).

Plaintiff also has offered indirect evidence " 'that the [Defendant's] profered explanation is unworthy of credence.' " *Godwin*, 150 F.3d at 1220 (quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095). Specifically, she offers evidence that she never threatened Bianco, thereby calling into question the reason she was summoned for the meeting at which Cherek decided to terminate her. This evidence is not the "substantial" indirect evidence necessary to establish pretext when considered alone because it pertains to only one of the purported bases for termination. *See id.* However, when considered together with the direct evidence of pretext, the indirect evidence provides additional support.

Because the evidence Plaintiff has already set forth establishes a prima facie case of retaliation and creates a genuine issue of material fact with respect to pretext, Defendant is not entitled to summary judgment on Plaintiff's retaliation claim. Therefore, granting Defendant leave to file a motion for summary judgment on the retaliation claim would be futile. Instead,

the Court will order the parties to prepare and file a proposed final pretrial order and prepare for a final pretrial conference.

### III. Defendant's Request for Summary Judgment on the Extent of Plaintiff's Damages

Defendant also requests summary judgment regarding the extent of back pay Plaintiff will be able to obtain if she prevails. On November 28, 1994, several months after Defendant terminated her in February, 1994, Plaintiff began working for Johnson Freight Lines collecting unpaid accounts receivable. (Pl.'s Dep. at 40–41; New Hire Cover Sheet and Certification of Authenticity, Exh. D to DSOF). Plaintiff avers that, sixth months later, in approximately June of 1995, she left this position for a medical reason—specifically, for the remainder of her pregnancy, she was required to remain sitting with little movement. (Pl.'s Dep. at 40–42). Apparently she resumed searching for work three months after the birth of her child. (*Id.* at 50). Defendant argues that, from the point Plaintiff left the position with Johnson Freight Lines, her maximum damages are limited to the difference between what she would have earned working for Defendant and what she would have earned had she remained working for Johnson Freight Lines.

▆▆▆ Defendant's argument necessitates an overview of the legal rules pertaining to the duty to mitigate damages. This statutory duty, contained in Title VII [7] and made applicable to ADA actions by 42 U.S.C. § 12117(a), requires that a plaintiff use reasonable diligence in seeking other employment following her termination. *See Ford Motor Co. v. EEOC*, 458 U.S. 219, 231, 102 S.Ct. 3057, 3065, 73 L.Ed.2d 721 (1982); *see also Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1497 (9th Cir.1995). Defendant cites decisions in which circuit courts have held that a plaintiff's duty to mitigate includes a duty not only to find, but also to maintain, substantially similar employment, though it cites no Ninth Circuit decisions addressing the issue. *See EEOC v. Delight Wholesale Co.*, 973 F.2d 664, 670 (8th Cir. 1992) (cited in Def.'s Mot. at 12); *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1277 (4th Cir.1985) (same). Relying on either *Brady* or *Delight Wholesale Co.*, which in turn relies on *Brady*, several other courts have reached the same conclusion. *See Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 696 (2nd Cir.1998); *Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927, 936 (5th Cir.1996), *cert. denied*, 519 U.S. 1091, 117 S.Ct. 767, 136 L.Ed.2d 713 (1997); *United States v. City of Chicago*, 853 F.2d 572, 579 (7th Cir.1988); *Barbour v. Medlantic Mgmt. Corp.*, 952 F.Supp. 857, 864 (D.D.C.), *aff'd w'out opinion sub nom., Barbour v. Merrill*, 132 F.3d 1480 (D.C.Cir.1997); *Sennello v. Reserve Life Ins. Co.*, 667 F.Supp. 1498, 1513 (S.D.Fla.1987); *aff'd*, 872 F.2d 393 (11th Cir.1989).

Due to the obligation to maintain substantially similar employment once it is found, an employee generally tolls the running of the back pay period by voluntarily removing herself from the job market. *Brady*, 753 F.2d at 1278. However, this portion of the Fourth Circuit's decision in *Brady* must be understood in context. Employees deemed to have "voluntarily removed [themselves] from the job market" are those who fail to make "reasonable and good faith efforts to maintain [their subsequent employment]".[8] *Brady*, 753 F.2d at 1277; *see also Patterson*, 90 F.3d at 936 (quoting *Brady* ). This limitation is consistent with, or merely a restatement of, the general requirement that the employee's exercise of diligence be reasonable. *See*

---

7. The statute at issue, 42 U.S.C. § 2000e–5(g)(1), provides in relevant part:

Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.

8. Even if a claimant's termination is considered voluntary, back pay is not tolled if the claimant left for compelling or justifying reasons rather than for personal convenience. *Brady,* 753 F.2d at 1278.

*Patterson,* 90 F.3d at 936 (concluding that "reasonable diligence" inquiry contains two parts, reasonable diligence in both finding and maintaining substantially similar employment). Thus, rather than a focus on whether the decision was truly "voluntary", the inquiry remains focused on whether the Plaintiff's decision to leave her subsequent position violated the duty to use reasonable diligence to maintain the position.

The Ninth Circuit has held that the inquiry into an employee's reasonable diligence must be "tailor[ed] ... to the particular circumstances of the individual employee." *E.E.O.C. v. Pape Lift, Inc.,* 115 F.3d 676, 684 (9th Cir.1997). *See also Deffenbaugh–Williams v. Wal–Mart Stores, Inc.,* 156 F.3d 581 (5th Cir.1998) (evaluating reasonable diligence in light of individual characteristics of claimant and job market), *vacated,* 169 F.3d 215 (5th Cir.), *reinstated in relevant part on rehearing,* 182 F.3d 333 (5th Cir.1999) (*en banc* ). Decisions addressing employees' reasonable diligence in maintaining subsequent positions offer useful illustrations. In *Deffenbaugh–Williams,* the plaintiff obtained a position with another retailer following her termination from Wal–Mart, but resigned after she was sexually assaulted at a residence in a lower-income area to which she had moved due to her decreased job earnings. 156 F.3d at 591. Given these particular circumstances, the Fifth Circuit rejected Wal–Mart's argument that the former employee did not use reasonable diligence in maintaining substantially similar employment and upheld a jury's conclusion that the plaintiff satisfied her duty to mitigate her damages. *Id.* In contrast, the Fourth Circuit concluded that employees terminated by their subsequent employers for violating workplace rules did not use reasonable diligence to maintain their subsequent employment. *Brady,* 753 F.2d at 1279.

▪ Applying this individualized inquiry to the instant action, Plaintiff has offered evidence that she left her position with Johnson Freight Lines due to a medical restriction on movement, a restriction imposed for the duration of her pregnancy. Construed in the light most favorable to the Plaintiff, the evidence indicates that Plaintiff had to leave her position or put her pregnancy at risk. This evidence creates a genuine issue of material fact with respect to whether Plaintiff complied with her duty to mitigate damages by using reasonable diligence to maintain subsequent employment. Therefore, Defendants are not entitled to a summary judgment ruling that Plaintiff's damages following her resignation from Johnson Freight Lines are limited to the difference between what she would have earned working for Defendant and what she would have earned working for Johnson Freight Lines.

Accordingly,

**IT IS ORDERED** granting Defendant's Motion for Summary Judgment in part and denying it in part. Summary judgment is granted on Plaintiff's claim of unlawful termination based on disability and denied with respect to the issue of whether Plaintiff's potential damages for back pay are limited to the difference between what she would have earned working for Defendant and what she would have earned at her subsequent position, for the time period after she left the latter. (Dkt.# 78).

**IT IS FURTHER ORDERED** that Defendant is not entitled to summary judgment on Plaintiff's claim of retaliatory discharge.

**IT IS FURTHER ORDERED** that the parties are to inform the court by Friday, September 3, 1999, whether or not they request this Court to appoint a judge to conduct a settlement conference.

**IT IS FURTHER ORDERED** that the parties shall file a proposed Final Pretrial Order with respect to the remaining claim of retaliatory discharge no later than Friday, September 24, 1999. Motions in Limine shall be filed on the same date. A

final pretrial conference is set for Friday, October 22, 1999 at 1:30 p.m.