Stephen E. WILSON and Gloria
Wilson, his wife, Plaintiffs,

v.

AETNA LIFE AND CASUALTY COM-
PANY, Aetna Casualty Insurance
Company, the Aetna Casualty and
Surety Company, Travelers/Aetna
Property Casualty Corp., Travelers In-
surance Group Incorporated, and
Travelers Property Casualty Insur-
ance Company, Defendants.

No. 98–CV–407C(M).

United States District Court,
W.D. New York.

March 25, 2002.

Law Offices of Eugene C. Tenney, Buffalo, NY (Courtney C. Genco, of Counsel), for Plaintiff.

Epstein Becker & Green, P.C., Buffalo, NY (Amy J. Beech, of Counsel), for Defendants.

## INTRODUCTION

CURTIN, District Judge.

Plaintiff Stephen Wilson alleges that defendant Aetna Life and Casualty Company ("Aetna")[1] terminated his employment in late July 1994 because of his age and disability, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"); the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"); and the New York State Human Rights Law, N.Y. Exec. Law § 290, *et seq.* (McKinney 1993) ("NYS HRL"). In the present motion, Aetna moves for partial summary judgment on Wilson's claims under the NYS HRL-arguing that they are time-barred-and on the claim asserted under the ADA-arguing that Wilson is not disabled under that Act. Item 67. The court heard oral argument on September 28, 2001. Following oral argument, the court issued an order directing the parties to file a brief statement concerning the law that applies on the New York State Human Rights claim. Item 78. Plaintiff submitted a letter-memorandum. Item 80.

---

1. Plaintiff has also named what appear to be a number of Aetna's predecessors and successors in interest. The court will refer to these various entities conveniently as "Aetna," especially since defendants do not-for the purposes of this motion-contend that any of these corporate entities have been improperly named. *See* Item 68, p. 8 n. 3.

## PROCEDURAL BACKGROUND

Wilson commenced employment with defendants on December 21, 1970. Item 1, ¶ 19. In July 1994, Wilson was working as a claim representative in the field operations unit of Aetna's Buffalo office. On July 28, 1994, Aetna notified Wilson of its intent to terminate his employment-or "deselect" him-as part of a reduction-in-force. On March 6, 1995, Wilson filed a charge of discrimination with the New York State Division of Human Rights ("DHR"), in which he alleged that Aetna had discriminated against him on July 28, 1994 on the basis of his age and disability in violation of the NYS HRL. The complaint was simultaneously cross-filed with the Equal Employment Opportunity Commission ("EEOC"). Item 71, Ex. B. On October 27, 1997, the DHR issued a letter indicating that there was probable cause to believe that Aetna had discriminated against Wilson based on both age and disability. Item 68, Ex. D. Plaintiff received a right-to-sue letter from the EEOC on April 3, 1998. Item 1, Ex. A. On June 29, 1998, Wilson commenced the present action. The DHR issued a dismissal for administrative convenience on Wilson's charges on April 10, 2000. Item 67, Ex. E.

## FACTS

For the purposes of Aetna's motion for partial summary judgment, the material facts are as follows.[2] Wilson began noticing a partial loss in his hearing some time in the late 1970s. As a result of his hearing loss, Wilson found that he constantly needed to ask people to repeat themselves in the course of normal conversation. Item 71, Ex. G, pp. 127–28. Wilson felt compelled to "do something" about his hearing loss after he realized how trying it

was for his family to deal with his brother-in-law, who, in Wilson's words, was "half deaf." Item 67, Ex. A, p. 128.

Wilson's doctor, Dr. Fredric Hirsh, referred him to Dr. Stephen Sobie, a local otolaryngologist. Item 71, Ex. H, p. 6. On December 12, 1991, Wilson consulted with Dr. Sobie regarding his hearing loss. *Id.* at 6–7. Wilson told Dr. Sobie that he was having difficulty hearing, but that there was no ringing in his ears and that he was not experiencing dizziness. *Id.* at 7. Dr. Sobie performed a hearing test and found that Wilson had "mild hearing loss." *Id.* He recommended that Wilson consider hearing aids. *Id.* In a letter to Dr. Hirsh, dated December 16, 1991, Dr. Sobie diagnosed Wilson with "mild high frequency sensorineural hearing loss bilaterally." *Id.* at 12. Dr. Sobie told Dr. Hirsh that he felt Wilson would be an excellent candidate for a hearing aid. *Id.* at 13. He testified that Wilson had "some nerve loss in the mid frequencies. It's not purely [in the] high frequencies . . . ." *Id.* at 12. Asked at deposition whether the use of a hearing aid would correct Wilson's hearing loss, Dr. Sobie demurred, explaining that it would depend on his lifestyle. If, for example, he watched the television all day, he would not need a hearing aid. But "If he was in situations where he required very acute hearing or the best hearing that was possible, going to meetings, going to lectures et cetera, then he might consider a hearing aid." *Id.* at 13. The decision on whether a patient should be fitted with hearing aids inevitably "depends on how much trouble [the patient is] having in what situations, et cetera." *Id.* at 15. He deferred to the clinical experience and technical competence of audiologists as the ones with expertise to make that decision. *Id.*

---

**2.** All ambiguities and inferences that may be reasonably drawn from the facts must be viewed in the light most favorable to the non-

moving party. *See Coach Leatherware Co. v. AnnTaylor, Inc.,* 933 F.2d at 167.

Dr. Sobie referred plaintiff to Ann Stadelmaier, an audiologist, for routine hearing screening.[3] *Id.* at 8–9. Wilson met with her on December 21, 1991. In Wilson's initial conversation with Ms. Stadelmaier, he discussed the hearing difficulties he was having. Her notes referred to his having to ask people to repeat themselves, his difficulties in hearing people with soft voices, and his difficulty in hearing people at parties, meetings, and classes. *Id.*, Ex. I, p. 26–27, & Ex. J, Tab B. She discussed options with him, such as the pros and cons of amplification and the need to adjust to hearing aids. *Id.* She recommended that he be fit for two hearing aids, but he indicated he just wanted one. *Id.*, Ex. I, pp. 27–28. In her notes, Ms. Stadelmaier noted that he opted for only one because he was "[n]ot in a position emotionally or financially at this point to consider binaural" hearing aids. *Id.* at 26 & Ex. J., Tab B. Wilson wanted the "smallest aid possible," and Stadelmaier recommended a particular model. *Id.*, Ex. I, p. 31.

During this visit, Stadelmaier performed speech audiometry and pure tone audiogram hearing tests. *Id.* at 10–15 and Ex. J, Tab B. In light of the audiogram test results, Stadelmaier concluded that Wilson could hear most vowel sounds and low to mid-range sound frequencies, but that he had difficulty hearing high frequency consonant sounds in both ears-with the right ear being significantly worse than the left. *See* Item 71, Ex. I, pp. 11–15, and Ex. J, Tab B. Stadelmaier's audiometry test showed that Wilson had excellent "speech discrimination"-or clarity of hearing-in his left ear, while the speech discrimination in his right ear was well below normal. *See* Item 67, Ex. G, p. 18.[4]

Overall, Stadelmaier found that Wilson had a 15 percent loss of hearing in his right ear and a 7.5 percent loss in his left ear. Item 71, Ex. I, p. 29. Taken together, plaintiff's overall hearing loss-or his "binaural" hearing loss-was measured at 8.75 percent.[5] *Id.* Put another way, Stadelmaier stated that Wilson had "approximately [a] 50 decibel hearing loss on the high frequency end, [and] normal hearing in the low frequency ...." *Id.* at 30.[6] Stadelmaier concluded that Wilson had "sensory neural hearing loss, that means that the structure of the ear appears to be normal but the nerves of hearing ... are damaged. And very often with sensory neural hearing loss we see not only diminished loudness but also diminished clarity, diminished discrimination, so it really can indicate what the prognosis is for amplification." *Id.* at 17.

On February 11, 1992, Wilson met again with Stadelmaier. She performed further

---

**3.** A doctor diagnoses hearing loss and refers patients to audiologists. The audiologist possesses diagnostic skills so as to differentiate the type of hearing loss the patient has, and determine whether the person is a candidate for amplification (hearing aids) or surgery. Item 71, Ex. I, p. 6. For the former group of candidates, Ms. Stadelmaier would perform hearing tests and fit them for hearing aids.

**4.** The audiometry test measures the clarity of the words that a patient is hearing, something referred to as speech discrimination. Item 67, Ex. G, pp. 16–17.

**5.** While Ms. Stadelmaier insisted at her deposition that these kinds of quantified percent-

ages of hearing loss "aren't terribly useful when you're talking about ... rehabilitation," Item 71, Ex. I, p. 30, other courts have looked to these same types of numbers when inquiring into whether a plaintiff's hearing loss renders him "disabled" under the ADA. *See, e.g., Finical v. Collections Unlimited, Inc.,* 65 F.Supp.2d 1032, 1038–39 (D.Ariz.1999).

**6.** While Wilson recalled offhand that he had "approximately an 18 percent loss of hearing in both of my ears," Item 71, Ex. G, p. 127, the testimony of Ms. Stadelmaier is to be credited on this point of fact.

tests, *id.* at 33–36, to determine where to set the hearing aid, so it would be "tailored to his particular needs." *Id.* at 38. In light of these tests, Stadelmaier determined that Wilson's speech discrimination without his hearing aid was 68 percent, but that his speech discrimination improved to 96 percent when he wore the hearing aid in his right ear.[7] *Id.* at 39–40. Beyond this assessment, though, Stadelmaier could not indicate whether Wilson's hearing was normal with the hearing aid. She would only say that the test results showed that the "hearing aid was performing up to my expectations," *id.* at 40, and that it was amplifying high frequency sounds but not sounds with lower frequencies. *Id.* at 38. When asked whether Mr. Wilson would have an improved level of hearing with the hearing aid, so that he could hear conversation at a normal sound level, Stadelmaier's assessment was as follows:

> Depending on the listening environment, that's a critical factor that you have to really look at. In quiet one-to-one listening situations, I think that's reasonable to expect that he would be able to do that[.][I]n more difficult listening situations, noisy environments, crowds, parties, restaurants, noisy office, whatever.

> He-especially considering he only had the hearing aid in one ear, he would still have difficulty in those situations, or I would expect that he would have difficul-

ty in those situations. I don't know whether he did indeed have difficulty. *Id.* at 47–48. Stadelmaier explained that she never actually had an opportunity to test Wilson's hearing *with* the hearing aid, since Wilson did not return for the recommended follow-up visits. *See* Item 71, Ex. I, pp. 40–41, 44–45. "[W]e verified that the hearing aid was performing, but we never validated whether he was getting adequate performance with the hearing aid . . . ." *Id.* at 43.

The record reveals that Wilson's hearing aid was repaired periodically. *Id.* at 44–45. On June 1, 1992, Mrs. Wilson dropped it off with the complaint of "no volume." *Id.*, Ex. J, Tab B. It took two weeks to repair. On January 21, 1993, the hearing aid was again dropped off. The notation on his record was "aid very weak. Needs repair." It was back from repair on February 5, 1993. Once again, on August 20, 1993, the aid was dropped off with the notation, "Aid has no usable volume until almost full on where it then sounds distorted." It was returned on September 10, 1993. *Id.*, Tab B, p. NP 23.

For his own part, Wilson described the effects of his mitigated hearing loss [8] in the following way:

Q: Okay. And your hearing with-with the hearing aids, how would you describe [your hearing]?

A: Stinks. . . . I take them out a lot of the time. If I'm in a car, all you hear is

---

7. When Wilson did not wear his hearing aid, he heard only seventeen out of twenty-five words that were spoken at a conversational level of 50 decibels. Item 71, Ex. I, p. 39. When Wilson put his hearing aid in, he was able to hear twenty-four of the twenty-five words spoken at the same level. *Id.* at 40.

8. Though the record is unclear on this point, it appears that Wilson was wearing only one hearing aid-in his right ear-at the time of his termination in July 1994. Wilson has ex-

plained that the aids were too expensive for him to buy a pair from the outset. By the time of his deposition in January 1999, though, it is clear that Wilson was wearing hearing aids in both ears. This distinction is largely irrelevant, though, since plaintiff seems to describe his mitigated impairment (*i.e.*, his hearing loss with the help of hearing aids) in the same terms whether he's describing his hearing with one or two hearing aids. *See infra.*

"shh shh shh." You turn on the heater or the-the air-conditioner in the car, and you-"shh shh shh." You can't hear the radio. You hear a loud-sometimes you just feel like your head is spinning because everything-you hear yourself-sometimes I feel like I'm yelling. I feel like I'm yelling at you now and-

Q: You're not.

A: I guess you would say something if I was, but it's-it can make conversations difficult.

Q: Okay.

A: I mean, people talk at different levels, and some-some-my biggest problem was women. I worked with a whole office full of women at Aetna, and I had a hard time hearing a lot of them. Not all of them. Some women just had a different tone that I could hear okay. But-

. . . . .

Q: And with your hearing aid, what is the effect of your hearing loss on your ability to conduct your life?

A: I–I don't have to interrupt people quite as often. . . .

Without the hearing aids, I-if I was in a conversation with you, I'd be constantly interrupting you and saying, "What" and asking you to repeat things. With the one hearing aid I would-was able to hear a lot better.

. . . . .

Q: With your hearing aid, were you able to perform the functions of your job appropriately?

A: Yes.

Q: So that it did not impair-your hearing loss with the hearing aid did not impair your ability to do your job.

A: I could get the job completed, but, again, I had to interrupt people and-and have them repeat things, and it-it may have possibly made it a little more burdensome for other people.

Q: But you did your job. I mean, is that correct?

A: Yes.

Item 71, Ex. G, pp. 129–33.

The only specific limitations that Wilson attributed to his hearing loss-as mitigated by hearing aids-was an inability to go swimming with the hearing aids and, as previously indicated, continuing problems with ambient noise and background noise. More specifically, when Wilson was in a car that had its air conditioning on, he could hear little else except the "whisper" of the air conditioner. Wilson also stated that it was nearly impossible for him to carry on a conversation in a bar or a restaurant, since the noise created by nearby conversations and the "tinkling of glasses" made it difficult for him to hear what someone at his table was saying to him. *See* Item 67, Ex. A, pp. 129–30, 137–38.

Asked whether he requested any kind of accommodation for his hearing impairment at work, Wilson said he talked about getting a special telephone with someone, although he couldn't remember who it was. Item 71, Ex. G, p. 132. However, he "realized that with the one hearing aid, that it was-there wasn't any sense in getting it, so I–I just said the heck with it." *Id.* at 132–33.

## DISCUSSION

### I. The Human Rights Law Claims

■ Claims asserted under New York's Human Rights Law are governed by a three-year statute of limitations. New York State CPLR § 214(2); *see also Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir.1998). The statute of limitations for the Human Rights Law is tolled, however, during the pendency of a

complaint filed with the New York State Division of Human Rights. *See Penman v. Pan Am. World Airways,* 69 N.Y.2d 989, 517 N.Y.S.2d 719, 510 N.E.2d 803 (Ct.App.1987) (citing CPLR § 204(a)).

Defendants argue that despite that tolling, "persons who request an ACD [administrative convenience dismissal] under the 1997 Amendments [to the Human Rights Law] are denied this tolling option." Item 76, p. 2, quoting *New York State National Organization for Women v. Pataki,* 189 F.R.D. 286, 306 n. 6 (S.D.N.Y.1999). As a result, argue defendants, plaintiff's HRL claim is time-barred.[9] Plaintiff responds that the 1997 Amendments do not apply because the legislative history underlying those amendments "unequivocally demonstrates that [they] are not retroactive" and thus have nothing to do with the instant action. Item 80, p. 2, *citing* McKinney's Cons.Laws of NY, Book 1, Statutes § 51[b], Commentary to Statutes § 51[b], and legislative history of the 1997 Amendments as reported in McKinney's 1997 Session Law of New York, Chapter 374 S. 5110–A, § 3.

■ The court finds plaintiff's argument a correct statement of the law as applied to this case. CPLR § 204 tolls the statute of limitations during the pendency of an administrative complaint with the DHR. *Pan American,* 61 N.Y.2d at 549, 475 N.Y.S.2d 256, 463 N.E.2d 597. While the 1997 Amendments, effective August 6, 1997, eliminate that tolling provision,[10] § 3 of the 1997 Amendments provide that "[t]his act shall take effect immediately." As plaintiff points out, both McKinney's Cons.Laws of NY, Book 1, Statutes § 51(b) and *Morales v. Gross,* 230 A.D.2d 7, 657 N.Y.S.2d 711 (2d Dept.1997) explain that longstanding rules of statutory construction construe statutes as prospective unless the language of the statute, expressly or by implication, requires retroactive effect. Further, if a statute provides that it is "effective immediately," it is accorded only prospective effect. *Morales,* 230 A.D.2d at 10, 657 N.Y.S.2d 711.

In this case, the allegedly discriminatory act-Wilson's termination-occurred in late July 1994, and plaintiff did not commence this action until late in June 1998–well in excess of the three-year limitations period. However, Wilson filed his complaint with the NYS DHR in March 1995 and then received the agency's determination in late October 1997. The statute of limitations was tolled for more than two and one-half years, the 1997 Amendments have no effect, and plaintiff's HRL claim is not time-barred.

Because the court has found that the 1997 Amendments are not applicable to this case, defendants' argument that the court is divested of jurisdiction in this matter until the DHR issued the administrative convenience dismissal also has no merit.

9. At oral argument, defendants' counsel observed that plaintiffs had not raised the issue that the 1997 Amendments were not retroactive, and thus they did not address it in their papers. The court provided counsel for both parties an opportunity to clarify these issues following oral argument. Item 81, p. 28. Plaintiff submitted a letter memorandum, Item 80, but defendants did not submit any further argument.

10. Section 2, ¶ 9 of S. 5110–A, of Chapter 374 provides: "Notwithstanding subdivision (a) of section two hundred four of the civil practice law and rules, if a complaint is so annulled by the division, upon the request of the party bringing such complaint before the division, such party's rights to bring such cause of action before a court of appropriate jurisdiction shall be limited by the statute of limitations in effect in such court at the time the complaint was initially filed with the division."

## II. The Americans with Disabilities Act Claim

### A. *Standards of Law*

#### 1. *Defining a disability under the ADA.*

The ADA prohibits discrimination in the hiring, advancement, or discharge of an otherwise qualified employee because of such individual's disability. 42 U.S.C. § 12112(a). Plaintiff must first establish a *prima facie* case of disability discrimination which requires him to show that: (1) he is "disabled" within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of his job; and (3) he suffered adverse employment action because of his disability. *Wernick v. Federal Reserve Bank*, 91 F.3d 379, 383 (2d Cir.1996). Aetna's motion on the ADA claim is predicated on the argument that Wilson cannot meet the threshold burden of establishing that he is "disabled" under the Act.

An individual is considered disabled, within the meaning of the ADA, if he: (1) has a physical or mental impairment that substantially limits one or more of the major life activities; (2) has a record of such an impairment; or (3) has been regarded as having such an impairment. 42 U.S.C. § 12102(2)(A)-(C). Here, Wilson only alleges that he is disabled under the first of these three categories: that the physical impairment of hearing loss substantially limits his major life activity of hearing. Aetna neither disputes that Wilson suffers from a physical impairment, nor does it dispute that hearing is a major life activity. *See* Item 68, p. 11 n. 5. Therefore, the only disputed issue is whether Wilson's physical impairment, *i.e.,*

his hearing loss, "substantially limits" the major life activity of hearing.[11]

The relevant regulations define "substantially limits" as:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to ... the average person in the general population ....

29 C.F.R. § 1630.2(j)(1). Further, whether an impairment substantially limits a major life activity is determined in light of (1) the nature and severity of the impairment, (2) its duration or expected duration, and (3) its permanent or expected permanent or long-term impact. 29 C.F.R. § 1630.2(j)(2) (2000). The limitation must be significant rather than a mere difference in ability to perform the activity. *See Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999).

In *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), the Supreme Court held that corrective and mitigating measures must be considered in determining whether an individual is disabled under the ADA. *Id.* at 482, 119 S.Ct. 2139. As such, courts must examine how an impairment affects a plaintiff's life activities in light of his attempts to correct the impairment. Under *Sutton*, this court must examine Wilson's *mitigated* hearing loss-his hearing as assisted by hearing aids-when determining whether his hearing is substantially impaired. *See Ivy v. Jones*, 192 F.3d 514, 516 (5th Cir.1999). Furthermore,

---

11. A physical impairment does not necessarily constitute a disability under the ADA, even when the impairment clearly affects a major life activity such as hearing. *See Hazeldine v. Beverage Media, Ltd.*, 954 F.Supp. 697, 703 (S.D.N.Y.1997).

"whether a person has a disability under the ADA is an individualized inquiry"- there are no *per se* rules as to what is or is not a disability. *Sutton,* 527 U.S. at 483, 119 S.Ct. 2139. Courts are not only to consider the disability in its mitigated state, but also are to "consider any negative side effects suffered by an individual resulting from the use of mitigating measures ...." *Id.* at 484, 119 S.Ct. 2139.

Finally, the court emphasizes that the *only* inquiry here is whether Wilson's mitigated hearing loss substantially limits the major life activity of *hearing,* since hearing is the only major life activity that plaintiff has alleged is impaired by his hearing loss. *See* Item 72, p. 6. As a result, the court rejects Aetna's arguments that are directed at Wilson's ability to engage in major life activities other than hearing. For example, Aetna argues that evidence of Wilson's inability to carry on a conversation in a restaurant or bar is insufficient to show a disability since it merely indicates how the hearing aid affects Wilson's "leisure life." Item 68, p. 14. Again, the issue here is whether Wilson's mitigated hearing loss substantially limits his *hearing,* not whether his hearing loss substantially limits other life activities such as going out to eat at a restaurant or swimming for exercise.

### 2. *Parties' Reliance on Precedent.*

Defendant Aetna attempts to liken this case to *Matlock v. City of Dallas,* 1999 WL 1032601 (N.D.Tex., Nov.12, 1999), where the plaintiff suffered from a hearing loss but was deemed not disabled as a matter of law under the ADA. In *Matlock,* the

plaintiff's "mitigated hearing loss in [terms of] frequency ... [was] 12.5% in his left ear and 0% in his right ear." *Id.* at * 3. Thus, the court concluded, the plaintiff had "virtually normal hearing with the use of hearing aids." *Id.*

Plaintiff Wilson, on the other hand, likens the facts of this case to those in *Finical v. Collections Unlimited, Inc.,* 65 F.Supp.2d 1032 (D.Ariz.1999), where the court found that there were material questions of fact as to whether the plaintiff's *unmitigated* hearing loss rendered her disabled under the ADA.[12] Mr. Wilson draws parallels between the nature of his *mitigated* hearing loss and the *Finical* plaintiff's *unmitigated* hearing loss and argues that he, like the plaintiff in *Finical,* should survive summary judgment.

 In light of the Supreme Court's trio of decisions in *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); *Murphy v. United Parcel Service, Inc.,* 527 U.S. 516, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999); and *Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999), one thing is clear: the inquiry into whether a plaintiff is disabled under the ADA is a fact intensive inquiry that must be made on a case-by-case basis. As a result, precedent is often of marginal value in evaluating the nature of a plaintiff's particular impairment and how it impacts his life. Thus, it is not surprising that this case differs significantly from *Matlock.* Unlike the plaintiff in that case, Wilson's hearing is not "virtually normal" when he wears hearing aids.[13] *See infra.* And

---

12. Unlike Mr. Wilson, the plaintiff in *Finical* did not use hearing aids to mitigate her hearing loss. 65 F.Supp.2d at 1037. The court there found it appropriate, then, to assess the plaintiff's impairment in its uncorrected state. *Id.* at 1038–39.

13. As summed up by plaintiff's counsel during oral argument,

There has been absolutely no testimony in this case that Mr. Wilson was able to use hearing aids to have normal hearing, he had continued problems with the hearing aid that he had, and didn't have two. This

while *Finical* is perhaps closer to the facts of this case than *Matlock,* it is still distinct. In *Finical,* the record provided a more detailed look at the precise nature of the plaintiff's hearing loss than the one that is available here (or available in *Matlock*). *E.g.,* 65 F.Supp.2d at 1040–41 ("Dr. Olson concluded that Plaintiff 'misses' about 37 percent of ... 'normal speech' ... includ[ing] approximately half of the vowel sounds.... Dr. Olson further opined that Plaintiff would have difficulty hearing in either a setting in which more than one person is speaking at a time or any setting with a great deal of background noise."). Also, in *Finical,* the plaintiff, who did not wear hearing aids but used compensatory measures such as lip-reading, still found it difficult to hear in "situations involving a great deal of background noise, such as crowds or offices in which multiple people are speaking." *Id.* at 1043. In the end, the court must make its own determination of whether there is a question of fact on the issue of disability.

### B. *Analysis*

 The ultimate issue on this motion is relatively straightforward: whether there is sufficient evidence for a jury to conclude that Wilson is " 'significantly restricted as to the condition, manner or duration under which [he] can [hear] as compared to the condition, manner or duration under which the average person in the general population can [hear.]' " Item 72, p. 15 (quoting 29 C.F.R. § 1630.2(j)(1)). In answering this question, it is appropriate for the court to assess: (1) the nature and severity of the impairment, (2) its

duration or expected duration, and (3) its permanent or expected permanent or long-term impact. 29 C.F.R. § 1630.2(j)(2) (2000).

The evidence relating to this issue is essentially limited to the following: the objective evidence of Wilson's hearing loss that was offered by Dr. Sobie and Ms. Stadelmaier; Ms. Stadelmaier's opinion as to the difficulties plaintiff would likely experience even when using his hearing aids; and, most importantly, Wilson's description of how his mitigated hearing loss limits his ability to hear in different situations and settings.

Taken as a whole, this evidence shows that Wilson suffered from a hearing loss in and around the time he was terminated. There is evidence that his hearing, without a hearing aid, substantially limited his major life activity of hearing. He had employed mitigation measures in the form of one hearing aid. In terms of duration, Wilson's hearing loss-even when mitigated-is permanent.

Further, the condition and manner in which he hears differ significantly from the condition or manner in which an average person can hear. While Wilson's mitigated hearing loss has not been measured in terms of percentages, tests conducted in February 1992 indicated that the hearing aid improved his conversational speech discrimination from 68 percent to 96 percent. However, the speech discrimination test was conducted in a sound-proof booth, *see* Item 71, Ex. I, p. 38, while a great deal of everyday conversation takes place in settings with significant ambient or back-

---

case is distinguishable from *Matlock* because in this case the Plaintiff was only using one hearing aid, when two were prescribed, and he had ongoing problems with his hearing aid. There are records in my papers showing that he was bringing the hearing aid in to be repaired, it required adjustment and repair, and he often had to go without his hearing aid. He had difficulty with loudness and background noises when using his hearing aid, and he testified that his hearing stunk, that was not the testimony of the plaintiff in *Matlock.* Item 81, pp. 23–24.

ground noise, *see id.* at 47–48. On this score, Wilson has testified to a variety of situations and settings in which he has significant difficulty hearing what people say in the course of ordinary conversation. Specifically, Wilson has problems carrying on a conversation in a car when the air-conditioner or the heater is on, since the sound of the forced air through the vents prevents him from hearing. In addition, Wilson has problems hearing people in places like restaurants or bars, where several factors contribute to background noise. Similarly, Wilson related to Stadelmaier that he had the same difficulties in his professional life when he attended a meeting or a class where there was a large group of people in attendance. Item 71, Ex. I, p. 31. Furthermore, Stadelmaier offered the opinion that Wilson would likely have continued difficulties with his hearing in "crowds, parties, restaurants, noisy office, whatever." Item 71, Ex. I, pp. 47–48. And lastly, given that Wilson had continued difficulties with his hearing aid, his ability to mitigate his hearing loss would appear to be problematic during those periods of time when it was not working well and when it was being repaired.

In sum, the evidence relating to Wilson's mitigated hearing loss could support a finding of a significant and continued impact on plaintiff's life. While a conversational speech discrimination rate of 96 percent might indicate that Wilson's impairment is not terribly severe, there is no denying that his hearing loss has and will continue to have a significant impact on his day-to-day quality of life. Indeed, it is no small matter for Wilson to be unable to carry on conversations in commonplace settings like a car, a conference hall, a noisy office, a classroom, or a crowded restaurant.

## CONCLUSION

For the reasons discussed herein, the court finds that Wilson's claims under the New York State Human Rights Law were timely asserted. The court also finds that there are material questions of fact as to whether Wilson's mitigated hearing loss substantially limits the major life activity of hearing. Therefore, Aetna's motion for partial summary judgment, Item 67, is denied.

The court will hold a telephone conference with counsel on April 23, 2002, at 10 a.m. to set a further schedule in this case.

So ordered.